**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT HIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 24-cv-02525 |
| | ) | |
| v. | ) | Honorable Lindsay C. Jenkins |
| | ) | |
| UNIVERSITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

# DEFENDANT UNIVERSITY OF CHICAGO'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Scott L. Warner
Mary E. Deweese
Husch Blackwell LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
(312) 655-1500 (tel.) | (312) 655-1501 (fax)
scott.warner@huschblackwell.com
mary.deweese@huschblackwell.com

*Attorneys for Defendant*
*University of Chicago*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii
INTRODUCTION ........ 1
STATEMENT OF FACTS ........ 1

I. Plaintiff's Dates of Enrollment and Applicable Policies and Procedures ........ 1
II. Plaintiff's Request for Accommodations and SDS Policies and Procedures ........ 2
III. Plaintiff's Academic and Professionalism Challenges and PSOM's Efforts to Support Him During His First Three Years (2018-2019, 2019-2020, 2020-2021) ........ 3
IV. Plaintiff's Medical Leave of Absence and Continued Challenges After Returning ........ 5
V. The April 30, 2023 Email Incident and the Conference Abstract Issue ........ 6
VI. The CAP's Unanimous Decision Recommending that Plaintiff Be Dismissed ........ 9
VII. Plaintiff's Appeal and the AAC's Unanimous Recommendation to Uphold the CAP's Decision ........ 11
VIII. The PSOM Dean's Final Decision to Dismiss Plaintiff ........ 13

LEGAL STANDARD ........ 13
ARGUMENT ........ 14

I. The University is Entitled to Summary Judgment on All of Plaintiff's Claims Under the ADA and the Rehabilitation Act (Counts I-II & IV-V) ........ 15
   A. The Record Establishes that Plaintiff Is Not Otherwise Qualified. ........ 16
   B. Plaintiff Was Not Denied a Reasonable Accommodation (Counts IV-V). ........ 18
   C. Plaintiff Was Not Dismissed from PSOM Because of His Disability (Counts I-II). ........ 22
II. The University is Entitled to Summary Judgment on Plaintiff's Contract Claim. ........ 26
   A. Plaintiff Cannot Establish the Breach of Any Identifiable Contractual Promise. ........ 27
   B. No Reasonable Jury Could Find that the Decision to Dismiss Was Arbitrary and Capricious. ........ 30

CONCLUSION ........ 30

## TABLE OF AUTHORITIES

**Cases**

*A.J.T. ex rel. A.T. v. Osseo Area Schs. Indep. Sch. Dist. No. 279*, 605 U.S. 335 (2025) .............. 26

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .............. 14

*Bolin v. Bd. of Trs. of Univ. of Illinois*, No. 13-1117, 2015 WL 14098021 (C.D. Ill. June 12, 2015) .............. 24

*Bunn v. Khoury Enters., Inc.,* 753 F.3d 676 (7th Cir. 2014) .............. 22

*Carlson v. Carroll Univ.*, No. 09-C-551, 2011 WL 5921445 (E.D. Wis. Nov. 28, 2011) .............. 19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............. 13, 14

*Christian v. St. Anthony Med. Ctr.*, 117 F.3d 1051 (7th Cir. 1997) .............. 18

*David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508,* 846 F.3d 216 (7th Cir. 2017) .............. 22, 23

*DeFranco v. N.Y. Power Auth.*, 731 F. Supp. 3d 479 (W.D.N.Y. 2024) .............. 19

*Despard v. Bd. of Trs. of Indiana Univ.*, No. 1:14-CV-1987-WTL-DML, 2015 WL 4946112 (S.D. Ind. Aug. 18, 2015) .............. 24

*Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595 (7th Cir. 2011) .............. 22

*DiPerna v. Chicago Sch. of Pro. Psychology*, 893 F.3d 1001 (7th Cir. 2018) .............. 30

*Doe v. Columbia College Chicago*, 933 F.3d 849 (7th Cir. 2019) .............. 26, 27, 30

*E.W. v. Mt. Vernon Cmty. Sch. Corp.*, No. 25-2991, 2026 WL 2639512 (7th Cir. Sept. 8, 2026) .............. 26

*Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598 (7th Cir. 2012) .............. 22

*Gates v. Caterpillar, Inc.*, 513 F.3d 680 (7th Cir. 2008) .............. 25

*Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873 (7th Cir. 2022) .............. 26

*Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170 (7th Cir. 2013) .............. 18

*Gratzl v. Off. of Chief Judges of 12th, 18th, 19th, & 22nd Jud. Cirs.*, 601 F.3d 674 (7th Cir. 2010) .............. 15

*Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454 (4th Cir. 2012) ..... 17, 20, 21, 22, 24

*Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661 (7th Cir. 2023) .............. 26

*Hill v. Kansas City Area Transp. Auth.*, 181 F.3d 891 (8th Cir. 1999) .............. 20

*Hilliard v. Loyola Univ. of Chicago*, No. 20-CV-01144, 2026 WL 509014 (N.D. Ill. Feb. 24, 2026) .............. 22, 23, 24

*Hunter v. Carl Buddig & Co.*, No. 24 2529, 2025 WL 358934 (N.D. Ill. Jan. 31, 2025) .............. 18

*J.A.M. v. Nova Se. Univ., Inc.*, 646 F. App'x 921 (11th Cir. 2016) .............. 21, 24

*Khan v. Midwestern Univ.*, 879 F.3d 838 (7th Cir. 2018) .............. 16, 17

*Knapp v. Nw. Univ.*, 101 F.3d 473 (7th Cir. 1996) .......... 16

*Kurylo v. Parkhouse Nursing & Rehab. Ctr., LP,* No. CV 17-00004, 2017 WL 1208065 (E.D. Pa. Apr. 3, 2017) .......... 19

*Metzler v. Loyola Univ. Chicago*, 164 F.4th 612 (7th Cir. 2026) .......... 30

*Mintz v. Caterpillar Inc.*, 788 F.3d 673 (7th Cir. 2015) .......... 29

*Novak v. Bd. of Trs. of S. Illinois Univ.*, 777 F.3d 966 (7th Cir. 2015) .......... 15, 22, 24, 25

*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). .......... 22

*Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806 (7th Cir. 2015) .......... 19

*Raethz v. Aurora Univ.*, 805 N.E.2d 696 (Ill. App. Ct. 2004) .......... 27

*Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985) .......... 16

*Royan v. Chicago State Univ.*, No. 20 CV 2014, 2024 WL 1489337 (N.D. Ill. Apr. 5, 2024), *aff'd*, 145 F.4th 681 (7th Cir. 2025) .......... 15, 16, 17, 25

*Royan v. Chicago State University*, 145 F.4th 681 (7th Cir. 2025) .......... 21

*Schoper v. Bd. of Trs. of W. Ill. Univ.*, 119 F.4th 527 (7th Cir. 2024) .......... 20

*Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540 (7th Cir. 2011) .......... 14

*Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349 (6th Cir. 2015) .......... 19

*Siefken v. Vill. of Arlington Heights*, 65 F.3d 664 (7th Cir. 1995) .......... 20

*Singer v. Raemisch*, 593 F.3d 529 (7th Cir. 2010) .......... 14

*Willis v. Noble Env't Power, LLC*, 143 F. Supp. 3d 475 (N.D. Tex. 2015) .......... 19

*Zimmeck v. Marshall Univ. Bd. of Governors*, 106 F. Supp. 3d 776 (S.D.W. Va.), *aff'd,* 632 F. App'x 117 (4th Cir. 2015) .......... 19

**Statutes**

42 U.S.C. § 12102 .......... 18

**Rules**

Fed. R. Civ. P. 56 .......... 13

This action arises out of the University of Chicago's ("University") decision to dismiss Plaintiff Robert Hight ("Plaintiff") from the Pritzker School of Medicine ("PSOM") after he sent an email impersonating another student to a medical resident who had evaluated him in a clerkship and criticizing the resident for not just giving all students the highest possible grade (the "April 30, 2023 email incident"). After a seven-member faculty committee unanimously recommended that Plaintiff be dismissed, he claimed for the first time in his appeal of that decision that he was under the influence of a sleep medication at the time of the incident. The six-person appeal committee determined that this explanation, even if true, did not excuse the April 30, 2023 email incident or Plaintiff's history of poor professionalism and other academic deficiencies. In total, 12 PSOM faculty members, one PSOM student, and the PSOM Dean all unanimously determined after an extensive review of his academic history that Plaintiff should be dismissed. Plaintiff seeks to overturn these academic judgments and the outcome of the multi-level process that resulted in his dismissal. He claims that (1) the University failed to accommodate what he labels as a "Medication Reaction Disability," (2) the dismissal decision was the product of disability discrimination, and (3) this decision violated his contractual rights. The record shows that Plaintiff's assertions are unsupported by actual evidence and leaves nothing for a jury to decide.

## STATEMENT OF FACTS

### I. Plaintiff's Dates of Enrollment and Applicable Policies and Procedures

Plaintiff was a PSOM student from Autumn 2018 until his dismissal became final in September 2023. SOF 1, 150.[1] Plaintiff was familiar with various policies that applied to him, including PSOM's Academic Guidelines ("Guidelines") that contained (1) professionalism

[1] Citations to "SOF" are to the relevant paragraph numbers of the University's Local Rule 56.1 Statement of Material Facts, filed concurrently with this Memorandum of Law.

standards and other degree requirements and (2) policies and procedures used to monitor student performance and address performance deficiencies. SOF 2-26. As stated in the "Requirements for Advancement" section of the Guidelines:

> **Passing grades in individual courses are necessary but not alone sufficient for attainment of the MD degree from [PSOM]. Failure to demonstrate appropriate ethical or professional behavior may in itself be a cause for dismissal from [PSOM] despite passing academic performance.**

SOF 23; *see also* SOF 6, 12-15 (examples of professionalism requirements in Guidelines).

PSOM faculty could address professionalism concerns within the grading system or by issuing a "Professionalism Concern Report" ("PCR"). SOF 16. PSOM's Academic Progress Committees ("APCs") were comprised of course/clerkship directors for different years of the PSOM curriculum and were responsible for monitoring student progress and making recommendations to the Committee on Academic Promotions ("CAP") for monitoring, remediation, or other interventions. SOF 17. The CAP was a faculty committee that, among other things (1) had the discretion to consider the status of any student at any time, even if their academic record was satisfactory, and place students on Monitored Academic Status ("MAS") or Academic Probation; and (2) had the discretion to recommend that a student be dismissed for failure to demonstrate appropriate ethical or professional behavior. SOF 16-23. Student appeals of CAP decisions were heard by the Academic Appeal Committee ("AAC") composed of five voting senior faculty members and, if requested by the appealing student, one voting student member, which then made a recommendation to the PSOM Dean for a final decision. SOF 26.

## II. Plaintiff's Request for Accommodations and SDS Policies and Procedures

Student Disability Services ("SDS") is responsible for determining a student's eligibility for disability accommodations and had published policies informing students how to notify the University of a disability and request accommodations. SOF 33-37. SDS had a practice to not grant

accommodations that would apply retroactively; essential program requirements, such as professionalism, also could not be lowered or modified. SOF 36, 38. Plaintiff admits that students with accommodations were still required to comply with PSOM's professionalism standards. SOF 39. Plaintiff (1) submitted an accommodation request form before he started at PSOM that identified the conditions of attention-deficit/hyperactivity disorder ("ADHD"), anxiety, and sickle cell anemia, and (2) requested the accommodations of extra time on exams, a note taker, and a separate testing location. SOF 41. All of these accommodations were granted and were helpful to him; Plaintiff never requested any other accommodations from SDS. SOF 42-43.

## III. Plaintiff's Academic and Professionalism Challenges and PSOM's Efforts to Support Him During His First Three Years (2018-2019, 2019-2020, 2020-2021)

During his first two years, Plaintiff passed all of his courses, which were graded on a Pass/Fail basis, but he was still considered to be a low performer in three of these courses. SOF 44. PSOM made arrangements for Plaintiff to start academic counseling, which resulted in Plaintiff receiving approximately 89 hours of services at an estimated cost to the University of $20,000. SOF 46. Plaintiff began his third-year clinical clerkships—most of which were graded on a scale of Honors (H), High Pass (HP), Pass (P), or Failure (F)—in the 2020-2021 academic year, but he did not complete his third-year clerkships until Spring 2023. SOF 11, 47. During his Internal Medicine clerkship in Autumn 2020, Plaintiff used an intern's note of a patient visit as his own work in a presentation. SOF 49. He then failed a required "shelf exam" in his Pediatrics clerkship in Autumn 2020, but successfully remediated it in Spring 2021. SOF 50.

Plaintiff also received a PCR in December 2020 from the Pediatrics Clerkship Director, Dr. Nicola Orlov, after she determined that Plaintiff had been "deceitful" with respect to his multiple requests to be absent from the clerkship, including by:

(1) misrepresenting the length of his lecture period, for which he missed clerkship, as being from 12 to 3 pm on one day when in fact it was only for one hour;

(2) providing inconsistent explanations regarding the type of medical appointment he said he had on another day; and
(3) not giving timely notice of his symptoms and need for time away from training or timely scheduling a COVID test when he said he was ill, resulting in several days where Plaintiff was absent from the clerkship.

SOF 51-55. Dr. Orlov did not question Plaintiff's diagnosis, his pain, or the course of his illness, but she was clear that it was his responsibility to obtain approval for, and notify clinical directors about, any missed clinical time. SOF 54. Plaintiff admitted to Dr. Orlov that he did a "poor job" of planning his absences and "handling things in a professional manner." SOF 53. Plaintiff then requested a two-month leave of absence and, upon his return, to do the "Directed Study – Extended Curriculum Option" ("ECO")—which permits students to decompress their course load—"due to the difficulties [he] faced as [he] progressed through the clerkships." SOF 9, 59. The CAP approved this request and encouraged Plaintiff to meet with the CAP Chair and another faculty member before returning to clinical rotations to maximize the likelihood of success, as the CAP took the filing of the PCR in Pediatrics very seriously. SOF 60.

In Spring 2021, Plaintiff failed the Obstetrics-Gynecology ("OB/GYN") clerkship after failing the shelf exam twice with testing accommodations in place. SOF 62. There were also concerns reported about Plaintiff's professionalism, clinical skills, and communications. SOF 63. After Plaintiff failed the OB/GYN shelf exam the first time, the CAP placed him on MAS as of May 14, 2021, which "indicates that there has been a history of academic challenges and that [Plaintiff's] primary focus should be on [his] academic achievement[.]" SOF 64; *see also* SOF 20. After he failed this exam a second time, thereby failing the clerkship, the CAP placed him on Academic Probation as of August 2, 2021 because of his "previous academic struggles" and his three shelf exam failures. SOF 62, 65. Academic Probation reflected that the CAP was concerned Plaintiff was at significant risk of failing to complete the M.D. program. SOF 65; *see also* SOF 21.

## IV. Plaintiff's Medical Leave of Absence and Continued Challenges After Returning

Plaintiff requested a medical leave of absence on or about July 30, 2021 because he "felt very overwhelmed with his disabilities and [] needed time to recover" and was under "a lot of psychological stress" due to his grandmother having cancer. SOF 65-66. The CAP approved this request and was supportive of Plaintiff's decision to focus on his health and wellbeing. SOF 65. In his petition to return, Plaintiff said he had "been able to find healthcare providers that have addressed [his] health concerns, and the time off allowed [him] to recover mentally, physical[ly], and emotionally" and "also prepare[] academically so [he] can do well once he return[s]." SOF 67. Plaintiff returned from leave after about 11 months. SOF 65-69. The CAP informed Plaintiff that he would remain on Academic Probation upon his return, which reflected the CAP's concern that he remained at significant risk of failing to complete the M.D. degree. SOF 68.

Before starting his second attempt at the OB/GYN clerkship in January 2023, Plaintiff asked to replace his night shift schedule with a day shift schedule. SOF 72. Clerkship Director Dr. Carrie Smith granted this request. *Id*. Plaintiff received a High Pass for this clerkship. SOF 73. In February 2023, Plaintiff sent an email to OB/GYN resident, Dr. Sydney Dautel, who had given Plaintiff a mix of Passes and High Passes and raised professionalism concerns in her evaluation, including that Plaintiff (1) was only on time one of two days on rotation, (2) had only "sometimes" read the case prior to surgery, and (3) did not introduce himself to the patient prior to surgery during "preop." SOF 74-75. In his email, Plaintiff told Dr. Dautel that he did not agree with how critical she was in his evaluation, did not believe her appraisal of his performance was fair, and believed that some of what she commented on was outside the scope of what a third-year medical student can do. SOF 75. Dr. Smith urged Plaintiff to strongly consider Dr. Dautel's feedback and asked that Dr. Dautel reflect about where she could give feedback earlier in the process. SOF 76. Also in February 2023, Plaintiff sent an email to Dr. Smith regarding the evaluation he received

from another OB/GYN resident, Dr. Meagan Brockman, who had given Plaintiff mostly Passes and one High Pass in her evaluation. SOF 77-78. In his email, Plaintiff asked for more information about Dr. Brockman's evaluation. SOF 78. Plaintiff testified that he was pleased with the additional information Dr. Smith provided. SOF 78. During the 2022-2023 academic year, the APC and the CAP discussed Plaintiff at every one of their meetings. SOF 70.

**V. The April 30, 2023 Email Incident and the Conference Abstract Issue**

As communicated to Plaintiff in its May 1, 2023 letter, the CAP removed Plaintiff from Academic Probation and placed him back on MAS, noting that the CAP continued to be concerned about Plaintiff's academic progress but recognized the improvement in his performance. SOF 80. At the time of this letter, the CAP was not aware of other significant professionalism issues that had arisen. *See* SOF 82-84, 99.

The day before the CAP's May 1, 2023 letter removing him from Academic Probation, at 5:43 a.m. on April 30, 2023, Plaintiff sent an email to OB/GYN resident Dr. Brockman (about whom he had recently emailed with Dr. Smith) using a Gmail address he created under the name of another student ("the April 30, 2023 email"). SOF 78, 82-84, 89, 97-98, 103-104. This email (1) criticized Dr. Brockman for not giving all students Honors grades; (2) stated that she came up "several times" in a discussion students had about residents who "either don't care, are unrealistically/unfairly strict, inequitable, jaded, or punish [students] with bad grades"; (3) said she was considered to be "mean/harsh/unkind" as a result of her grading practices; and (4) stated that many students experienced "great stress and frustration" working with her. SOF 83. Plaintiff admits to creating this email and causing it to be sent. SOF 89, 97-98, 103-104. In the instant litigation, Plaintiff claims that he has no memory of creating the Gmail account from which it was sent and claims that he was under the influence of zolpidem at the time of the April 30, 2023 email

incident. SOF 156.[2] But, in the immediate aftermath of the incident, Plaintiff never mentioned taking zolpidem and also provided multiple detailed narrative explanations of his conduct. *See* SOF 89, 91, 97-98, 103-104, 119. It was not until months later, after the CAP voted unanimously to recommend his dismissal and he had submitted an appeal, that he first alleged he had taken zolpidem on the night in question. SOF 111-112, 121, 126.

Upon receiving the April 30, 2023 email, Dr. Brockman forwarded it to Dr. Smith and two PSOM administrators that same day. SOF 84. PSOM then conducted an investigation that resulted in a determination that the email had been authored by Plaintiff, as Plaintiff admits. SOF 84; *see also* SOF 89, 97-98, 103-104. As part of this investigation, Dean of Students Dr. James Woodruff sent Plaintiff an email at 2:17 p.m. on June 13, 2023 requesting a meeting regarding "falsification of identity and inappropriate email communications" relating to an email a resident had received "that was not sent by the individual whose typed signature was on the email." SOF 85. At 3:24 p.m. that same day, the April 30, 2023 email and Dr. Brockman's response to that email were forwarded from the fake Gmail address to Plaintiff's boyfriend's email address. SOF 86. Then, just 16 minutes later, at 3:40 p.m. on June 13, 2023, Plaintiff responded to Dr. Woodruff's 2:17 p.m. email, saying he wanted to hear more about the situation and asking to meet. SOF 87.

Dr. Woodruff's notes of his June 16, 2023 meeting with Plaintiff state that Dr. Woodruff "spent the first part of the meeting reviewing the situation and presenting evidence to [Plaintiff]" which demonstrated that Plaintiff had authored the April 30, 2023 email under the name of another student. SOF 88. These notes then described Plaintiff's response to this evidence, which included

---

[2] Before the April 30, 2023 email incident, Plaintiff had received a prescription on April 21, 2023 for 20 pills of zolpidem (brand name: Ambien) 5 mg for insomnia with instructions to use it sparingly. SOF 81. Plaintiff told the prescribing physician that, as of May 12, 2023, he had taken zolpidem a total of four times with no indication in the note for this visit that Plaintiff had ever taken more than 5 mg of zolpidem. SOF 154.

initially being "noncommittal," "pointing out that he is not the only person in his class or in the school that is upset at the evaluation system . . . and is not the only one who could have targeted Dr. Brockman," and ultimately taking "responsibility for writing the email, discussing the email with his boyfriend, approving a plan for his boyfriend to send the email to Dr. Brockman, and providing his boyfriend with Dr. Brockman's email." SOF 89. Dr. Woodruff informed Plaintiff that he could be dismissed for this. SOF 90.

Dr. Woodruff subsequently informed Plaintiff that the CAP would consider this matter and that Plaintiff should write a letter to the CAP "explaining his behavior and his aspirations going forward." SOF 93. After reviewing a draft of Plaintiff's letter, in which Plaintiff asked that he not be placed on probation for the April 30, 2023 email incident, Dr. Woodruff told Plaintiff that he thought this request was "misguided" because the CAP would be evaluating whether Plaintiff should remain in medical school at all and whether he should be a doctor given that he had already been on Academic Probation. SOF 93-94. Dr. Smith viewed Plaintiff's conduct as raising an "egregious" professionalism concern, and on July 3, 2023, she issued a PCR for the April 30, 2023 email incident. SOF 95-96. Plaintiff told Dr. Smith that his "choice" to send the April 30, 2023 email was "immature and misguided, and it was not an appropriate way to handle [his] emotions, especially at 5 AM." SOF 97. Plaintiff also wrote a response to the PCR. SOF 98.

The April 30, 2023 email incident was not Plaintiff's only professionalism lapse during the Spring 2023 semester. PSOM faculty member Dr. Victoria Barbosa also learned that Plaintiff had submitted an abstract to a conference without properly crediting his co-authors. SOF 99, 101. If Dr. Barbosa had known that there had been other professionalism concerns regarding Plaintiff, she would have spoken with Dr. Woodruff at the time about whether this incident warranted a PCR. SOF 100. Dr. Barbosa reported this incident to Dr. Woodruff on or before July 11, 2023. SOF 99.

## VI. The CAP's Unanimous Decision Recommending that Plaintiff Be Dismissed

The CAP that considered whether Plaintiff should be dismissed was comprised of seven voting PSOM faculty members, with Dr. Chelsea Dorsey as the non-voting Chair. SOF 102. In his July 5, 2023 email to Dr. Dorsey attaching his letter to the CAP, Plaintiff said he "wanted to share [his] reflection and thoughts about the incident involving emailing the resident inappropriately," described in some detail what led him to do so, and said he "should have sought guidance from my mental and physical healthcare team to manage my emotions properly." SOF 103.

In his letter to the CAP, Plaintiff went into even more detail about the events that led him to create the fake Gmail account and prepare the April 30, 2023 email, (1) noting that his actions were "unjustified," "a complete and total lapse in judgment," and "unprofessional and unethical," (2) admitting again that he created the email account under the name of a classmate and drafted a message to Dr. Brockman regarding her evaluation practices, and (3) claiming that he could not bring himself to send this email so he had his boyfriend send it. SOF 104. As an explanation for his actions, Plaintiff stated, in relevant part:

> I was surprised at some of the feedback I received from two residents [in the OB/GYN clerkship]. . . . . I received a thorough explanation from one resident and no response from Dr. Brockman. I contacted [the clerkship director] Dr. Smith for insight into Dr. Brockman's evaluation. I received some explanation but never felt at peace with the situation.
>
> Nearly two months went by, and the lack of closure regarding my performance was among the many factors that contributed to what I would consider one of my worst bouts of depression to date. My depression and distress revolved around the fact that I was going into my fourth year, and I felt like I would be an inadequate physician based on the feedback I received, despite trying my best. Moreover, I would compare myself with my classmates, who had excellent evaluations and shelf scores, and constantly ask myself how I could achieve the same level of success. I was already on academic probation for failing my [OB/GYN] shelf [exam] twice and my pediatrics shelf [exam], and I didn't want to feel inferior to those around me. . . .
>
> On April 30th, I couldn't sleep and thought writing in my emotional journal would be a good idea. I wrote about several things that evening, and one of the topics I

> chose to write about revolved around my [OB/GYN] experience. I wrote my thoughts in the journal and how I wished I could have engaged more with Dr. Brockman.
>
> However, the actions I took when I decided to contact her were unprofessional and unethical. I created an email account under the name of my friend and former classmate, [redacted]. . . .

SOF 104. Plaintiff's letter to the CAP also stated that "[r]ather than demand explanations, I should take feedback graciously and use it for improvement." SOF 104. He also described the steps he had been taking to address his health challenges, including meeting with a therapist and working with his psychiatrist and primary care physician. SOF 104.

Consistent with the Guidelines: (1) before the CAP met to consider whether Plaintiff should be dismissed on July 14, 2023, Dr. Dorsey met with Plaintiff and informed him that he would be up for dismissal (SOF 25, 105-106); and (2) Dr. Dorsey presented Plaintiff's letter to the CAP during the July 14, 2023 CAP meeting (SOF 25, 108, 112). In its deliberations, the CAP noted that the April 30, 2023 email incident was "a really serious professionalism issue" and "there was a high concern that this did not bode well for future patients that [Plaintiff] would potentially be serving." SOF 113. The CAP also discussed three other instances of Plaintiff's unprofessional behavior: (1) his use of an intern's patient note as his own work for a presentation in Autumn 2020; (2) the issues addressed in the December 2020 PCR in Pediatrics; and (3) the abstract form he submitted in Spring of 2023 for a conference listing himself as the only author even though he was not. SOF 114; *see* SOF 49, 55, 99-101. As reflected in the CAP's decision letter, the CAP members "expressed serious concerns about [Plaintiff's] inability to meet the educational program's objectives and become a physician, especially as it relates to the bedrock requirement of professionalism, which informs [his] ability to be a trusted colleague and physician who always acts in the best interests of patients." SOF 112.

After the CAP deliberated, Dr. Dorsey sent Plaintiff a July 19, 2023 letter that identified the following four reasons for the CAP's unanimous recommendation that Plaintiff be dismissed:

(1) Repeated unprofessional behavior;
(2) The egregious nature of the most recent instance of unprofessional behavior involving the impersonation of another medical student [i.e., the April 30, 2023 email incident];
(3) Unprofessional behavior while on Monitored Academic Status; and
(4) Significant and sustained academic performance deficiencies.

SOF 111-112; *see also* SOF 113-118. This letter also informed Plaintiff that he had 21 days to appeal the dismissal recommendation. SOF 26, 112. Plaintiff emailed with Dr. Dorsey on August 2-3, 2023 with questions about the CAP's decision for purposes of preparing his appeal to which she responded. SOF 119-120.

## VII. Plaintiff's Appeal and the AAC's Unanimous Recommendation to Uphold the CAP's Decision

Plaintiff then submitted a timely appeal of about 150 pages on August 9, 2023, in which he claimed for the first time that he was under the influence of zolpidem at the time of the April 30, 2023 email incident. SOF 121, 125-126. His appeal stated that he had a "vague recollection" of the incident. SOF 126. As explained above, ***in each of Plaintiff's prior communications with and written submissions to Dr. Woodruff, Dr. Dorsey, Dr. Smith, and the CAP, Plaintiff had provided a detailed narrative regarding the April 30, 2023 email incident without making any reference to zolpidem or any claim that he did not remember the April 30, 2023 email incident***. SOF 89, 91, 97-98, 103-104, 119. Consistent with the Guidelines, Dean for Medical Education Dr. Vineet Arora selected five senior faculty members to serve as voting members of the AAC and selected a medical student to serve as a voting member at Plaintiff's request. SOF 26, 122. Each of these AAC members certified that they agreed to abide by PSOM's Conflict of Interest and Confidentiality Policy, and none of them identified any conflicts of interest. SOF 123-124.

Dr. Arora informed Plaintiff in an August 18, 2023 email of his right to have an advisor present at the AAC meeting and that a final decision regarding dismissal would not be rendered until the AAC made a recommendation to the PSOM Dean, who would make the final decision. SOF 128. The advisor Plaintiff initially selected could not attend the AAC meeting, and Plaintiff did not identify another advisor after Dr. Arora asked him to inform her if he would like to do so. SOF 133. On August 30, 2023, both Plaintiff and the AAC were provided with a 34-page packet of materials (the "Academic Case Appeal Document") and access to an electronic Box folder that contained additional materials referenced in that packet. SOF 130-134.

The AAC met on September 6, 2023, first hearing a summary of the CAP's decision from CAP Chair Dr. Dorsey, and then hearing from the Plaintiff and asking him questions relating to his appeal. SOF 135-140. The AAC then deliberated in closed session without Plaintiff present. SOF 141. In reaching its decision, the AAC considered all of the information that had been provided before the September 6, 2023 meeting and the information obtained during that meeting. SOF 141; *see also* SOF 138-140. The rationale for the AAC's unanimous recommendation that the CAP decision be upheld was set forth in a five-page memorandum. SOF 141-142. This memorandum identified several observations and concerns that led to the AAC's decision, including:

- "[Plaintiff's] unprofessional behaviors occurred with many 'guard rails' in place by the medical school. The AAC members expressed concern at how [Plaintiff] would behave in the future when caring for patients and working on a team, when many of these guard rails would no longer be present."
- "Impersonating a colleague via email would be cause for great concern--and likely disciplinary action--for even a seasoned faculty member."
- "While the introduction of zolpidem as a rationale for sending the email was theoretically possible, [the AAC] still felt that this was not enough to explain his track record of unprofessional behavior when he was not taking this medication."
- "[Plaintiff's] response to the incident, regardless of the cause, was considered [by the AAC to be] unsatisfactory, especially given the gravity of the situation and potential harm to others."

- "The [AAC] did not believe that [Plaintiff] had demonstrated significant progress over the period reviewed and was highly concerned that the pattern of unprofessional behavior that he demonstrated repeatedly while under stress was an indication that he could not function and care for patients in the stressful environments in which he would undoubtedly find himself if he were to continue pursuing a career in medicine."

SOF 142.

### VIII. The PSOM Dean's Final Decision to Dismiss Plaintiff

In reaching his decision to accept the unanimous recommendation of the AAC and uphold the unanimous decision of the CAP, PSOM Dean Dr. Mark Anderson reviewed (1) the above memorandum from the AAC, (2) a slide deck that summarized the CAP's decision and (3) the Academic Case Appeal Document that included the core part of Plaintiff's written appeal and the CAP's response to it. SOF 144, 150; *see also* SOF 129-130, 136, 142-143. Dean Anderson agreed with the CAP on the four reasons why the CAP unanimously recommended dismissal and with the conclusions of the AAC as set forth in the AAC's memorandum. SOF 146, 148; *see also* SOF 112. Dean Anderson also agreed with the AAC that even if Plaintiff was impaired by a medication at the time he sent the April 30, 2023 email, that incident was an "unusual and egregious activity" that "fits within a larger pattern of unprofessional behavior." SOF 149. Dean Anderson informed Plaintiff in a September 11, 2023 email that he had reviewed the recommendations of the AAC and had decided to uphold them, thus making the decision to dismiss Plaintiff final. SOF 150.

## LEGAL STANDARD

Summary judgment is appropriate when the materials in the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant satisfies this

initial burden, the non-movant may not rest upon the mere allegations or denials of the pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 547 (7th Cir. 2011) (quotations omitted). On summary judgment, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation, conjecture, or otherwise conclusory statements. *See Celotex*, 477 U.S. at 322-23; *Singer*, 593 F.3d at 533. A scintilla of evidence in support of the nonmovant's position is not sufficient to oppose a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 250-52.

## ARGUMENT

The claims that remain in this case, as set forth in the Second Amended Complaint ("SAC"), include claims that Plaintiff was dismissed from PSOM based on a disability, in violation of Title III of the Americans with Disabilities Act, as amended (the "ADA") (Count I) and Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act") (Count II). SAC, Dkt. 35, at ¶¶ 40-81; Dkt. 34 at 5-9;[3] *see also* Dkt. 54 at ¶¶ 49-81. Plaintiff's claims that the University failed to accommodate him in violation of the ADA (Count IV) and the Rehabilitation Act (Count V) by not considering whether to modify the sanction of dismissal in light of the alleged effects of zolpidem, which he labels as his "Medication Reaction Disability," also remain. SAC ¶¶ 95-133; Dkt. 34 at

[3] Although Counts I and II of the SAC, on their face, each include a failure-to-accommodate claim, the Court dismissed the failure-to-accommodate claims in Counts I and II in ruling on the University's motion to dismiss these claims from Plaintiff's First Amended Complaint. Dkt. 34 at 9-11. The failure-to-accommodate claims that remain pending are those that Plaintiff included in Counts IV and V of the SAC, which are premised on the theory that the University failed to accommodate what he labels as a "Medication Reaction Disability." SAC ¶¶ 95-133.

9-11; Dkt. 50 at 1-2. Finally, his breach of contract claim remains but only to the extent it is based on the alleged violation of certain procedural protections set forth in the University's published procedures (Count III). SAC ¶¶ 39, 82-94; Dkt. 34 at 11-14; Dkt. 50 at 2-3. For the reasons set forth below, the University is entitled to summary judgment on all remaining claims.

## I. The University is Entitled to Summary Judgment on All of Plaintiff's Claims Under the ADA and the Rehabilitation Act (Counts I-II & IV-V).

The record could not support a finding that the University discriminated against Plaintiff based on a disability or failed to accommodate his alleged "Medication Reaction Disability" in dismissing him from PSOM after multiple professionalism lapses. To make out a prima facie case of discrimination under either the ADA or the Rehabilitation Act, Plaintiff must show: "(1) that he suffers from a disability as defined in the statutes, (2) that he is qualified to participate in the program in question, and (3) that he was either excluded from participating in or denied the benefit of that program based on his disability." *Novak v. Bd. of Trs. of S. Illinois Univ.*, 777 F.3d 966, 974 (7th Cir. 2015).[4] Under the Rehabilitation Act, Plaintiff must prove that his disability was "the *sole* reason for the alleged discriminatory action," whereas under the ADA, his disability need only "be *a* reason for the challenged action." *Royan v. Chicago State Univ.*, No. 20 CV 2014, 2024 WL 1489337, at *8 (N.D. Ill. Apr. 5, 2024) (emphasis in original), *aff'd*, 145 F.4th 681 (7th Cir. 2025). To prove a failure to accommodate under both statutes, Plaintiff must establish "that: (1) []he is a 'qualified individual with a disability'; (2) the [University] was aware of [his] disability; and (3) the defendant failed to reasonably accommodate [his] disability." *See Gratzl v. Off. of Chief Judges of 12th, 18th, 19th, & 22nd Jud. Cirs.*, 601 F.3d 674, 678 (7th Cir. 2010). As an initial matter, all four of Plaintiff's ADA and Rehabilitation Act claims fail because there is no evidence that could

[4] "The Rehabilitation Act further requires that a plaintiff show that the program in which he was involved received federal financial assistance." *Novak*, 777 F.3d at 974. This element is not in dispute.

support a finding that he was "qualified" under PSOM's requirements. These claims also fail for several additional reasons, as outlined below.

**A. The Record Establishes that Plaintiff Is Not Otherwise Qualified.**

Plaintiff cannot establish any of his claims in Counts I-II and IV-V because he was not "otherwise qualified" to continue as a medical student in PSOM. As this Court explained in *Royan v. Chicago State University*:

> "In the context of a university, a person is 'otherwise qualified' if she is able to meet all of the program's requirements in spite of her disability, with or without a reasonable accommodation." *Khan v. Midwestern Univ.*, 879 F.3d 838, 844 (7th Cir. 2018) (citing *Knapp v. Nw. Univ.*, 101 F.3d 473, 482 (7th Cir. 1996)). "Academic decisions, such as whether a student is qualified for, or entitled to promotion within a program, must be left to the broad discretion of the academic institution." *Id.* The Court cannot "override" a university's decision on a student's qualification "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)).

2024 WL 1489337, at *10. Here, the evidence establishes that Plaintiff was a low performer in several of his first- and second-year courses. SOF 44. During his third year, he (1) failed three shelf exams; (2) engaged in at least two instances of unprofessional behavior—use of an intern's note as his own and the conduct resulting in the December 2020 PCR; and (3) was placed on MAS and then Academic Probation. SOF 49-55, 62-65. The University (a) provided the accommodations Plaintiff requested from SDS, (b) arranged for extensive academic coaching sessions, and (c) approved a leave of absence and use of the ECO. SOF 41-42, 45-46, 59-61, 65-69. Unbeknownst to the CAP at the time it removed him from Academic Probation and placed him back on MAS in Spring 2023, Plaintiff had two additional significant professionalism issues in Spring 2023: the April 30, 2023 email incident and his failure to credit his co-authors on an abstract submission. SOF 80, 82-84, 99-101.

Professionalism was an essential requirement of PSOM's curriculum, *see* SOF 6, 12-16, 19-23, one with which Plaintiff repeatedly failed to comply even though he received accommodations. As a result, Plaintiff was not otherwise qualified under PSOM's requirements. *See Royan*, 2024 WL 1489337 at *10-11; *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 462-64 (4th Cir. 2012) (student was not otherwise qualified without accommodation and there was no reasonable accommodation that would enable him to meet the program's professionalism requirements). As in *Halpern*, PSOM "identified professionalism as a fundamental goal of its educational program, and it required that students demonstrate professional behavior and attitudes prior to graduating," "explicated different aspects of professional behavior that the school sought to instill, such as the ability to collaborate with others and to admit mistakes gracefully," and "emphasized professionalism based on evidence that inappropriate and disruptive behavior by physicians increases adverse patient outcomes." *See* 669 F.3d at 463; *see also* SOF 6, 12-16, 20-23. The CAP, the AAC, and Dean Anderson all determined that Plaintiff failed to meet PSOM's requirements and that, in their academic judgment, he was not qualified to continue in the M.D. program. *See Halpern*, 669 F.3d at 462-64; *see also Royan*, 2024 WL 1489337 at *10-12 (student dismissed for failing pharmacy rotations due to lack of "substantive knowledge, professionalism, and ability to meet course expectations" was not otherwise qualified); *Khan*, 879 F.3d at 844-47 (medical student dismissed after multiple course failures was not otherwise qualified). There is no evidence of pretext[5] or a substantial departure from academic norms. Summary judgment on Counts I-II and IV-V is thus warranted for this reason alone.

[5] Pretext is further discussed in Section I(C), *infra*. That analysis applies with equal weight here.

### B. Plaintiff Was Not Denied a Reasonable Accommodation (Counts IV-V).

The University is also entitled to summary judgment on Plaintiff's failure to accommodate claims for at least three separate and additional reasons: (1) Plaintiff's alleged "Medication Reaction Disability" does not qualify as a disability; (2) any accommodation Plaintiff requested in his appeal was an unreasonable request for retroactive leniency or a second chance; and (3) Plaintiff's request in his appeal to be excused from PSOM's professionalism requirements was not a reasonable accommodation in any event. ***First***, although a medication reaction can qualify as a disability in narrow circumstances, those circumstances are not present here. Courts have recognized such a disability only where a medical professional has determined the medication is "truly necessary" for the treatment of an underlying condition "and not merely an attractive option." *Christian v. St. Anthony Med. Ctr.*, 117 F.3d 1051, 1052 (7th Cir. 1997). The evidence shows that zolpidem was not medically necessary because, at most, Plaintiff only took zolpidem for a brief period after it was prescribed on April 21, 2023 and took other sleep medications before and after taking zolpidem. *See* SOF 81, 154-156.

The record also establishes that any side effects from zolpidem were not disabling because they only occurred, at most, one time on April 30, 2023. Plaintiff testified that what he claims to have experienced on April 30, 2023 was a "one-time thing" and "something that has never happened in the past and has never happened again in the future." SOF 156; *cf. Hunter v. Carl Buddig & Co.*, No. 24 2529, 2025 WL 358934, at *3 (N.D. Ill. Jan. 31, 2025) (allegations of disability sufficient to survive dismissal where blood pressure medication caused frequent urination on an ongoing basis). While a transitory impairment may be a disability, that is only the case if the condition "**substantially** limits" a major life activity. *See* 42 U.S.C. § 12102 (emphasis added); *Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1170-73 (7th Cir. 2013). In contrast, Plaintiff alleges a one-time only episode caused *not* by a chronic condition, but by his limited use

of a medication that was not necessary to treat his insomnia. This one-time episode did not substantially impair a major life activity. Whatever side effects Plaintiff may have experienced from zolpidem on April 30, 2023 therefore do not qualify as disabling under the law. *See Willis v. Noble Env't Power, LLC*, 143 F. Supp. 3d 475, 483 (N.D. Tex. 2015) (Plaintiff's dehydration not disabling where evidence showed Plaintiff only experienced dehydration during "July 9th episode"); *see also DeFranco v. N.Y. Power Auth.*, 731 F. Supp. 3d 479, 492-493 (W.D.N.Y. 2024) (one-time "medical episode where [the plaintiff] blacked out" not disabling); *Kurylo v. Parkhouse Nursing & Rehab. Ctr., LP,* No. CV 17-00004, 2017 WL 1208065, at *4 (E.D. Pa. Apr. 3, 2017) ("stomach problem" that caused plaintiff to miss work for two weeks not disabling).

***Second***, Plaintiff did not timely request an accommodation for his alleged Medication Reaction Disability. *See* SOF 43, 103-104, 125-126. Generally, a plaintiff "must *request* an accommodation for his disability in order to claim he was improperly *denied* an accommodation under the ADA." *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015) (emphasis in original); *see also* Dkt. 34 at 9-10.[6] Plaintiff was aware of how to request an accommodation and had done so at the time he started at PSOM. SOF 41-43. The University was not required to provide an accommodation for any alleged "Medication Reaction Disability" because Plaintiff did not request one from SDS (or the CAP) at any time and, at most, informed the University of this alleged disability and requested an accommodation only as part of his appeal

[6] As this Court previously found, courts have recognized this at the summary judgment stage. *See* Dkt. 50 at 2 (citing Dkt. 48 at 7); *see* Dkt. 48 at 7 (citing *Preddie*, 799 F.3d at 813; *Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 353 (6th Cir. 2015); *Zimmeck v. Marshall Univ. Bd. of Governors*, 106 F. Supp. 3d 776, 782–83 (S.D.W. Va.), *aff'd,* 632 F. App'x 117 (4th Cir. 2015); *Carlson v. Carroll Univ.*, No. 09-C-551, 2011 WL 5921445, at *11 (E.D. Wis. Nov. 28, 2011)).

*after* the April 30, 2023 email incident had already occurred and *after* the CAP had already decided that he should be dismissed.[7]

The so-called treatment plan Plaintiff proposed in his appeal, SOF 125-127, was a request for retroactive leniency or a "second chance" that is not a reasonable accommodation as a matter of law. As this Court previously noted, "[i]t appears that the Seventh Circuit is among those courts holding that the ADA requires reasonable modifications, but not second chances, which is to say that when the accommodation a plaintiff seeks amounts to retroactive leniency, that is not a reasonable accommodation." Dkt. 50 at 2 (citing *Schoper v. Bd. of Trs. of W. Ill. Univ.*, 119 F.4th 527, 534 (7th Cir. 2024); *Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666-67 (7th Cir. 1995)); *see Schoper*, 119 F.4th at 534 ("[W]e have previously stated that requesting a second chance is not a reasonable accommodation when it does not request that the employer change anything, but rather simply requests an opportunity for the employee to change their behavior.") (*citing Siefken*, 65 F.3d at 666–67); *see also Halpern*, 669 F.3d at 464; *Hill v. Kansas City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999). Plaintiff's request was just that: a request for retroactive leniency.

*Halpern* is instructive here. In that case, the Fourth Circuit ruled that a medical student's accommodation request was untimely because (1) it was not until the student was appealing a recommendation of dismissal that he suggested "that his behavioral problems were manifestations of a disability"; (2) the request impermissibly sought a second chance because, by the time the request was made, the plaintiff "had already engaged in numerous unprofessional acts that warranted his dismissal"; and (3) it was unreasonable to require the medical school to allow the student to "further extend his medical education to have an opportunity to demonstrate his ability

[7] This Court has already rejected Plaintiff's claim that the University had an affirmative obligation to conduct an "individualized assessment" when deciding whether he should be dismissed. *See* Dkt. 34 at 10-11.

to behave professionally." *Halpern*, 669 F.3d at 464-65. This same rationale applies here. Under *Schoper*, *Siefken*, and *Halpern*, Plaintiff's retroactive request to be excused from PSOM's professionalism standards is not a reasonable accommodation as a matter of law.

***Third,*** regardless of whether any accommodation Plaintiff requested in his appeal is deemed to be a request for retroactive leniency or a second chance, it was still not a reasonable accommodation. As set forth in Section I(A), *supra*, complying with PSOM's professionalism standards is an essential requirement of the M.D. program. *See Halpern*, 669 F.3d at 464-66. Any request to be excused from those standards, regardless of when it is made, would be a fundamental program alteration. *See id.*; *see also Royan v. Chicago State University*, 145 F.4th 681, 684 (7th Cir. 2025) (Rehabilitation Act does not "exempt students from meeting legitimate academic standards" nor "require institutions that reasonably accommodate a student's disabilities to lower those standards"); *J.A.M. v. Nova Se. Univ., Inc.*, 646 F. App'x 921, 925 (11th Cir. 2016) (an accommodation of "excusal of misconduct [] would fundamentally alter . . . the nature of [the university's] osteopathic medicine program"). Nonetheless, the record shows that the AAC and the Dean still *did* consider the accommodation Plaintiff requested in his appeal, as well as his proffered explanation regarding the alleged impact of zolpidem at the time of the April 30, 2023 email incident. SOF 141-142, 144-145, 148-149. In sum, the AAC and PSOM Dean considered Plaintiff's request and determined in their judgment that it was not reasonable in light of PSOM's professionalism standards that are at the core of its curriculum and are central to preparing students to care for patients safely and with integrity.

There is yet another fatal defect in any accommodation Plaintiff requested for the first time in his appeal. There is no evidence that the treatment plan he proposed would have helped him meet PSOM's professionalism standards going forward in any event. Indeed, the components of

this plan had already been in place since well before the April 30, 2023 email incident. SOF 104, 127; *see Halpern*, 669 F.3d at 464-65 ("special remediation plan" that "included ongoing psychiatric treatment, participation in a program for distressed physicians, and continuing in the Medical School on strict probation" not a reasonable accommodation for medical student dismissed for failure to demonstrate professional behavior). For all of these reasons, the University is entitled to summary judgment on Counts IV and V.

### C. Plaintiff Was Not Dismissed from PSOM Because of His Disability (Counts I-II).

The University is likewise entitled to summary judgment on Plaintiff's disability discrimination claims. Plaintiff must identify "evidence that would allow a reasonable jury to infer that Defendant treated him differently because of his disability." *Hilliard v. Loyola Univ. of Chicago*, No. 20-CV-01144, 2026 WL 509014, at *5 (N.D. Ill. Feb. 24, 2026) (internal quotations omitted); *see also Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016). He may do so using direct methods of proof, such as an admission of discriminatory animus, and/or indirect methods of proof, including through the *McDonnell Douglas* burden-shifting framework.[8] *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508,* 846 F.3d 216, 224 (7th Cir. 2017); *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011); *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012).[9] No matter the framework used, "the core question

---

[8] Under the *McDonnell Douglas* framework, a plaintiff must establish a prima facie case of discrimination by presenting evidence that (1) he is disabled, (2) he is qualified to participate in the program, (3) he suffered an adverse action, and (4) nondisabled students were treated more favorably. *See Bunn v. Khoury Enters., Inc.,* 753 F.3d 676, 685 (7th Cir. 2014). If the plaintiff can establish a prima facie case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for any alleged adverse action toward the plaintiff. *Id.* Upon articulating such a reason, the defendant "is entitled to summary judgment unless the claimant can present sufficient evidence that the [defendants'] proffered reason is a pretext for discrimination." *Novak*, 777 F.3d at 974.

[9] "Following the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, courts utilize a holistic approach which supplements, rather than alters, the [*McDonnell Douglas*] burden-shifting framework for discrimination claims." *Hilliard*, 2026 WL 509014, at *5. "Courts still conduct the *McDonnell Douglas* analysis, however, if the parties present arguments 'in those terms,' but still assess the plaintiff's evidence 'cumulatively' under *Ortiz*." *Id.* (citing *David*, 846 F.3d at 224). "*McDonnell Douglas* is a means of organizing, presenting, and assessing circumstantial evidence." *David*, 846 F.3d at 224.

on summary judgment remains, 'has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?'" *Hilliard*, 2026 WL 509014, at *5 (citing *David*, 846 F.3d at 224). Here, the answer is clearly no.[10] The record is devoid of any evidence that could support a finding that Plaintiff was dismissed because of his disability, much less—as necessary to succeed under the Rehabilitation Act—***solely*** because of his disability.

***First,*** there is extensive evidence of PSOM's legitimate, non-discriminatory rationale for dismissing Plaintiff at all three levels of the process that culminated in his dismissal. *See* SOF 107-109, 111-118, 120, 130-131, 135-142, 144-150; *see also* § I(A), *supra*. Plaintiff had a history of academic and professionalism challenges—despite receiving all the accommodations he requested from SDS, as well as many hours of support from a learning specialist, the opportunity to take advantage of the ECO, a medical leave of absence, and other informal accommodations. SOF 41-46, 49, 50-70, 72, 74. PSOM made significant efforts to support him and keep him apprised of the CAP's ongoing assessment and monitoring of his performance. SOF 45-46, 60, 64-65, 68, 70, 80. He also had already been on Academic Probation and was still on MAS when PSOM learned of the April 30, 2023 email incident. SOF 65, 68, 80, 117. The CAP, the AAC, and Dean Anderson all agreed that this incident was an egregious instance of unprofessional conduct. SOF 112-113, 142, 146, 148-149. Both the CAP and AAC expressed concern for the safety of future patients if Plaintiff were permitted to continue in the M.D. program. SOF 113, 142. For these reasons, among others that are well-documented in the record, a total of 14 decision-makers at multiple levels of review unanimously agreed that, based on their academic judgment, dismissal was warranted. SOF

[10] If Counts I and II are premised on Plaintiff's alleged "Medication Reaction Disability"—as opposed to the disabilities Plaintiff had previously reported to SDS—they both fail because this alleged medication reaction is not a disability, as discussed *supra* at pp. 18-19. Nor has Plaintiff met the "otherwise qualified" prong of these claims, as discussed in Section I(A) above.

102, 111-118, 122, 141-142, 146-150. There is simply no basis for any finding of discriminatory intent on this record. *See Hilliard*, 2026 WL 509014, at *7 (summary judgment appropriate where "Loyola's decision to dismiss Plaintiff relied on several non-discriminatory factors"); *Bolin v. Bd. of Trs. of Univ. of Illinois*, No. 13-1117, 2015 WL 14098021, at *14 (C.D. Ill. June 12, 2015) ("Plaintiff's extensive history of unprofessionalism, even before his epileptic diagnosis, was enough to justify the Board's decision and shows Plaintiff was dismissed for a legitimate non-discriminatory reason"); *see also Novak*, 777 F.3d at 975 ("Any inference of discriminatory intent would be unreasonable in light of the undisputed evidence that the University repeatedly had accommodated [plaintiff's] PTSD.")

Moreover, it is not discriminatory to dismiss a student for misconduct even if the conduct was related to a disability. *See Despard v. Bd. of Trs. of Indiana Univ.*, No. 1:14-CV-1987-WTL-DML, 2015 WL 4946112, at *8 (S.D. Ind. Aug. 18, 2015) (applying well-established Seventh Circuit principle that "'[a]n employer may fire [or discipline] an employee for engaging in unacceptable workplace behavior . . . even if the behavior was precipitated by a [disability]'" to student claims under the ADA and Rehabilitation Act); *J.A.M.*, 646 F. App'x at 925-27 (medical school "is not required to excuse past misconduct, even if that misconduct is linked to a student's mental disability"); *Halpern*, 669 F.3d at 465-67 ("the law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability"). Thus, even if the April 30, 2023 email incident or Plaintiff's other deficiencies were related to a disability, dismissing him for failing to comply with PSOM's professionalism and other standards was still a legitimate, non-discriminatory basis for that decision.

***Second***, there is no evidence that the University's proffered reasons for dismissal are a pretext for discrimination. To show pretext:

> [Plaintiff] must demonstrate that [the proffered] reason constitutes a mistruth—a lie on the part of the defendants. Pretext means ... a phony reason for some action. Thus, the question before us is not whether the [University's] stated reason was inaccurate or unfair, but **whether the [University] honestly believed the reasons it has offered to explain the discharge**.

*Novak*, 777 F.3d at 976 (internal citations and quotations omitted) (emphasis added). Plaintiff cannot come close to meeting this burden. In *Royan*, this Court reasoned:

> The notion the Committee's reason was a "phony reason" is made all the more untenable because the Program accommodated Royan's disabilities time and again throughout her career. It strains credulity to suggest the Program went from helping Royan manage her disability to orchestrating a conspiracy to dismiss her based on that disability because of one non-Program preceptor.

2024 WL 1489337, at *12 n.15 (internal citations omitted); *see also Novak*, 777 F.3d at 977 (no evidence of pretext where "the record here shows that the defendants afforded [plaintiff] many accommodations to ensure that his disability did not interfere with his having a fair opportunity to meet the University's standards for this particular program"). Likewise, here the record is replete with examples of the University supporting Plaintiff and offering to assist him. *See* SOF 42-43, 45-46, 60-61, 64-70, 72, 76, 78, 80, 93. In sum, no jury could find that Plaintiff's disability was ***a*** reason for his dismissal, much less the ***sole*** reason for that decision.

***Third***, there is no evidence that similarly-situated nondisabled students were treated more favorably than Plaintiff was. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008). As Dr. Dorsey testified, none of the other students who received PCRs and/or were on Academic Probation during the time Plaintiff was a student at PSOM engaged in similarly egregious professionalism lapses as compared to Plaintiff. SOF 151-153. This further demonstrates the

absence of any discriminatory animus. For all of these reasons, the University is entitled to summary judgment on Counts I-II.[11]

## II. The University is Entitled to Summary Judgment on Plaintiff's Contract Claim.

As noted above, Plaintiff's breach of contract claim in Count III is limited to his allegations that the University failed to comply with several specific alleged procedural requirements in connection with his dismissal. There is no evidence from which a jury could conclude that the University breached its contract with Plaintiff. Plaintiff must prove: (1) the existence of a valid and enforceable contract; (2) his substantial performance; (3) a breach by the University; and (4) damages. *See Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 883 (7th Cir. 2022). To prove a breach, Plaintiff first "must point to an identifiable contractual promise that the defendant failed to honor." *See id.* at 883–84. He must also ***separately prove*** that the decision to dismiss him "was made arbitrarily, capriciously, or in bad faith." *See Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661, 670 (7th Cir. 2023) (cleaned up). As the Seventh Circuit has noted:

> Illinois courts have expressed a reluctance to interfere with academic affairs and have held that a student's breach of contract claim must involve decisions that were arbitrary, capricious, or made in bad faith. [The defendant university] would not be liable even if we find it exercised its academic judgment unwisely; rather it must have disciplined a student **without any rational basis**.

---

[11] Moreover, even if Plaintiff could survive summary judgment on his discrimination claims—which he cannot—he would not be entitled to monetary damages under either the ADA or the Rehabilitation Act. First, "[p]rivate parties cannot recover monetary damages under Title III of the ADA; only injunctive relief is available." Dkt. 34 at 14-15. Second, damages are only available under the Rehabilitation Act for intentional discrimination, which requires Plaintiff to establish that the University "acted with 'deliberate indifference' toward [him] based on [his] disability," *i.e.* to prove that the University "disregarded a 'strong likelihood' that the challenged action would 'result in a violation of [Plaintiff's] federally protected rights.'" *See E.W. v. Mt. Vernon Cmty. Sch. Corp.*, No. 25-2991, 2026 WL 2639512, at *5 (7th Cir. Sept. 8, 2026) (citing *A.J.T. ex rel. A.T. v. Osseo Area Schs. Indep. Sch. Dist. No. 279*, 605 U.S. 335 (2025)). Plaintiff cannot meet this high bar—the record does not support any reasonable inference of discriminatory intent given the wealth of undisputed evidence demonstrating the accommodations and other support provided to Plaintiff prior to his dismissal and the University's exercise of academic judgment in deciding that Plaintiff should be dismissed.

*Doe v. Columbia College Chicago*, 933 F.3d 849, 858 (7th Cir. 2019) (citations omitted) (emphasis added). The breach of an applicable procedure, alone, is insufficient to establish arbitrary and capricious conduct. Rather, that requires a finding that the University **"did not exercise its academic judgment at all."** *See id.* (citing *Raethz v. Aurora Univ.*, 805 N.E.2d 696, 700 (Ill. App. Ct. 2004) (emphasis added)). The record precludes any such finding.

### A. Plaintiff Cannot Establish the Breach of Any Identifiable Contractual Promise.

There is no support in the record for any of the procedural violations alleged by Plaintiff.[12] ***First***, Plaintiff claims that the University "failed to disclose known information that could impact his standing as a student prior to CAP's meeting to dismiss Plaintiff." SAC ¶ 39(c). But the Guidelines only state that the Associate Dean for Medical Student and Advising "will meet with the student to notify them" if a decision of the CAP "that could affect a student's status or advancement . . . will be made at an upcoming meeting." SOF 25. It is undisputed that this occurred. SOF 105-106; *see also* SOF 2-3, 5, 90, 93-94.

***Second***, Plaintiff claims that the University "failed to allow [him] ten (10) days before CAP's decision became effective" and "failed to allow Plaintiff ten (10) days to respond to CAP's decision to dismiss him (before the formal appeal)." SAC ¶ 39(d), (e). Although the CAP's July 19, 2023 letter did not state that Plaintiff could respond to the CAP's decision in writing, (1) the CAP's decision was only a recommendation that Plaintiff be dismissed; (2) Plaintiff had 21 days to appeal the CAP's decision; and (3) once Plaintiff filed his appeal, his dismissal did not become final until the PSOM Dean made his decision. SOF 1, 26, 111-112, 128, 150. The Guidelines

[12] As this Court has ruled, Plaintiff's breach of contract claim is limited to his allegations regarding the University's alleged breach of "specific procedural protections articulated in the University's guidelines regarding disciplinary proceedings." Dkt. 34 at 13-14; *see* Dkt. 50 at 2-3; *see also* SAC ¶¶ 39, 88-90. The Court has held that Plaintiff cannot proceed on his breach of contract claim to the extent it is premised on the University's obligation to comply with anti-discrimination laws (*see* SAC ¶ 39(i)) or on a "breach of implied tuition contract" theory (*see* SAC ¶¶ 83-84, 94). Dkt. 34 at 12-13; Dkt. 50 at 2-3; *see also* Dkt. 54 at ¶¶ 39(i), 83.

clearly state that Plaintiff was responsible for knowing the contents of the Guidelines, and Plaintiff did not ask that the CAP revisit the decision but rather pursued an appeal. SOF 2-5, 119-121. The undisputed evidence is insufficient to show any breach of the Guidelines given that Plaintiff was afforded the full 21 days to file his appeal, as provided by the Guidelines, and raised the medication reaction issue in his appeal that was then considered by both the AAC and the PSOM Dean before his dismissal became final.[13] SOF 26, 112, 121, 125-126, 141-142, 145, 149-150.

***Third***, there is no support in the record for Plaintiff's assertion that the University was contractually obligated to notify Plaintiff of the CAP and AAC members. SAC ¶ 39(f). There are no such requirements in the Guidelines that applied to the CAP and AAC proceedings. *See* SOF 18-26. Moreover, all of the members of the AAC completed forms certifying that they did not have any conflicts of interest even though this was not required by the Guidelines. SOF 26, 123-124. ***Fourth***, it is undisputed that, despite Plaintiff's allegation to the contrary, the University did indeed comply with the following Guidelines language: "The student may request to appear before the [AAC] to answer questions or to present any new relevant information." *See* SAC ¶ 39(g). The Guidelines are silent with respect to the length of time afforded to an appealing student. *See* SOF 26. Plaintiff (1) appeared before the AAC on September 6, 2023, (2) distributed a written statement at that meeting, (3) made remarks to the AAC, and (4) answered questions from the AAC—and the AAC additionally reviewed a voluminous record. SOF 126, 130-132, 135-142. There is no evidence that the University failed to comply with the Guidelines in this (or any other) respect.[14]

---

[13] Plaintiff made no mention of "his prescription medication reaction" in his emails with the CAP Chair after receiving the CAP's decision, but he did so in his appeal to the AAC. SOF 119, 121, 126. And the AAC and the PSOM Dean considered this in reaching their decisions. SOF 142, 145, 148-150.

[14] The evidence also shows that the University complied with the language in the Guidelines regarding Plaintiff's right to have an advisor present at the AAC meeting. SOF 26, 128, 133.

***Finally***, there is no evidence in the record that could support a finding that, as alleged by Plaintiff, the University's decision to dismiss him violated (1) the "Reporting Mistreatment" provision of the PSOM Student Treatment Policy or (2) the "Statement of Retaliation" in the University's Grievance Policy for Graduate Students ("Grievance Policy"). *See* SAC ¶ 39(a)-(b). With respect to Plaintiff's mistreatment reports regarding residents Audrey Zeis in December 2020 and John Lacci/Matt Milleman in October 2022, there is no evidence that the decision to dismiss Plaintiff was based on either of these reports. *See* SOF 56-58, 71, 112-118, 142, 146-150.[15] Moreover, both reports were submitted far too long – more than two years and about nine months, respectively – before the CAP's July 2023 decision to give rise to any inference of retaliatory motive, particularly given the intervening April 30, 2023 email incident and other reasons cited at all three levels of the dismissal process. *See, e.g., Mintz v. Caterpillar Inc.*, 788 F.3d 673, 681 (7th Cir. 2015) (nine-month interval between complaint and adverse performance evaluation insufficient to support inference of causation). With respect to the Grievance Policy, there is no evidence that Plaintiff ever filed a grievance that would trigger the Non-Retaliation provision of that policy. *See* SOF 31-32, 48, 79. In any event, there is nothing retaliatory about the University's assessment that Plaintiff was not internalizing feedback given that he had received a previous PCR before the April 30, 2023 email incident and had received other feedback, yet he still committed such an egregious professionalism lapse (and yet another instance of unprofessional conduct in connection with the abstract issue) after he had been on Academic Probation.

---

[15] The record also shows that PSOM took these reports seriously and addressed them in a timely manner even though Plaintiff (1) said his report regarding Dr. Zeis did not involve mistreatment and (2) asked that PSOM "do nothing" with his report regarding Drs. Lacci and Milleman. SOF 27-30, 56-57, 71.

### B. No Reasonable Jury Could Find that the Decision to Dismiss Was Arbitrary and Capricious.

The lack of evidence of any contractual breach, alone, entitles the University to summary judgment on Count III. Even if the Court were to find sufficient evidence of a contractual breach, there is no basis on which a reasonable jury could find that the decision to dismiss Plaintiff was arbitrary and capricious. As detailed above and in the SOF, the CAP, AAC, and PSOM Dean all carefully exercised their academic judgment not only in evaluating the egregious April 30, 2023 email incident but also in considering Plaintiff's overall performance as a student. In the end, two committees comprised of a total of 12 PSOM faculty members, the student AAC member, and the PSOM Dean all unanimously agreed that Plaintiff should be dismissed. There is simply no way for a jury to find that this comes close to lacking "any discernible rational basis" or the failure to "exercise [] academic judgment at all." *See Columbia Coll. Chicago*, 933 F.3d at 858; *see also Metzler v. Loyola Univ. Chicago*, 164 F.4th 612, 621 (7th Cir. 2026) (noting that "identifying procedural errors does not negate a rational basis" in affirming summary judgment because "[e]ven if [the] proceeding suffered from errors, a substantiated accusation of sexual misconduct constituted a rational basis" for student's dismissal); *DiPerna v. Chicago Sch. of Pro. Psychology*, 893 F.3d 1001, 1008 (7th Cir. 2018) (affirming summary judgment where there was at least "*some* evidence that plagiarism occurred" and no explanation for how the "composition [of the appeal panel] affect[ed] the rationality of the [panel's] decision") (emphasis in original). The University is entitled to summary judgment on Count III for this separate and independent reason as well.

## CONCLUSION

For the foregoing reasons, the University of Chicago is entitled to summary judgment on all remaining claims in the Second Amended Complaint (Counts I-V) and respectfully requests that this Court dismiss all of those claims and this action in their entirety with prejudice.

Date: October 30, 2026

Respectfully submitted,

s/ Scott L. Warner

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send electronic notification to the following counsel of record this 30th day of October 2026:

Joseph P. Selbka
MacDonald, Lee, & Senechalle, LTD
2300 Barrington Road, Suite 220
Hoffman Estates, Illinois 60169-2034
pleadings@pmllegal.com
(847) 310-0025

s/ Scott Warner