**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT HIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 24-cv-02525 |
| | ) | |
| v. | ) | Honorable Lindsay C. Jenkins |
| | ) | |
| UNIVERSITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT UNIVERSITY OF CHICAGO'S**
**LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant University of Chicago (or the "University"), by and through its undersigned counsel and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(a)(2), submits the following statement of undisputed material facts in support of its Motion for Summary Judgment.

## I. Background and Relevant Policies

1. Plaintiff Robert Hight was a medical student at the University of Chicago's Pritzker School of Medicine ("PSOM") from Autumn Quarter 2018 through the Summer Quarter 2023. **Tab 6** (Transcript of Deposition of Plaintiff Robert Hight ("Pl. Dep. Tr.")) at 114:14-115:9; **Tab 7** (Academic Transcript) (admitted to the record as Hight Ex. 19, *see* Tab 6 (Pl. Dep. Tr.) at 114:14-115:1).[1]

[1] In compliance with this Court's Case Procedures, a Table of Contents for all exhibits cited herein is included as Attachment 1 hereto.

The parties were given leave to file exhibits under seal as necessary. Dkt. 119. The policy documents included as exhibits are not confidential in nature and are filed as combined Attachment 2 hereto. They are identified by the electronic bookmark ("Tab") at which they may be found. The remaining exhibits will be filed under seal as a separate docket entry or entries. The exhibits filed under seal will likewise be identified by the Tab at which they may be found (beginning with Tab 6). Tabs are numbered consecutively across multiple combined PDF filings.

With respect to citations, for deposition transcripts, pin cites are to the page and line number (page:line) on which the cited testimony appears. For non-transcript exhibits, pin cites are to the Bates number on the cited page of the exhibit

2. While Plaintiff was a student at PSOM, the policies and procedures applicable to him included PSOM's Academic Guidelines, PSOM's Student Treatment Policy, and the University's Grievance Policy for Graduate Students. **Tab 6** (Pl. Dep. Tr.) at 30:4-31:9, 31:25-33:3, 331:11-332:11, 352:21-353:17; *see also* **Tab 1** (2022-23 Academic Guidelines) (admitted to the record as Hight Ex. 4, *see* Tab 6 (Pl. Dep. Tr.) at 30:4-17); **Tab 2** (2023-24 Academic Guidelines) (admitted to the record as Arora Ex. 84, *see* Tab 8 (Transcript of Deposition of Dr. Vineet Arora ("Arora Dep. Tr.")) at 22:23-23:11); **Tab 3** (Student Treatment Policy) (admitted to the record as Hight Ex. 64, *see* Tab 6 (Pl. Dep. Tr.) at 331:11-19); **Tab 4** (Grievance Policy for Graduate Students) (admitted to the record as Hight Ex. 77, *see* Tab 6 (Pl. Dep. Tr.) at 354:2-13).

3. Plaintiff was familiar with each of these policies and reviewed PSOM's Academic Guidelines before he started in PSOM and whenever he progressed to a different year, including before he started the 2022-2023 academic year. **Tab 6** (Pl. Dep. Tr.) at 30:4-31:9, 32:20-33:3, 331:11-19, 354:2-13.

4. The 2022-2023 Academic Guidelines were in effect as of August 9, 2022 through August 6, 2023, and the 2023-24 Academic Guidelines went into effect as of August 7, 2023. **Tab** 1 (Hight Ex. 4) at PLAINTIFF0000002; **Tab 2** (Arora Ex. 84) at UC0000007.[2]

### *A. The Academic Guidelines and Related Information regarding Professionalism in Medical Education*

5. The Academic Guidelines stated: "As a condition of enrollment in the Pritzker School of Medicine, every student must familiarize themselves with these guidelines and must comply with them. The University of Chicago Pritzker School of Medicine will not accept any assertion of

wherever possible. Where an exhibit does not have a Bates number, the pin cite is to the page number in the footer of the exhibit or, if there is no page number, the pin cite refers to what would be the page number if the exhibit were paginated consecutively (with the exhibit cover sheet being page 1).

[2] This Statement of Facts collectively refers to the 2022-23 and 2023-24 Academic Guidelines as the "Academic Guidelines" or the "Guidelines" except where otherwise specified.

ignorance of these provisions as a basis for exception to them. No student or group of students should expect to be warned individually to conform to any of the guidelines contained in this publication." **Tab 1** (Hight Ex. 4) at PLAINTIFF0000002; **Tab 2** (Arora Ex. 84) at UC0000007; *see also* **Tab 6** (Pl. Dep. Tr.) at 31:25-32:19.

6. PSOM's Educational Program Objectives 22, 23, 28, and 30-33, which all related to professionalism, stated that students will:

- Demonstrate sensitivity and responsiveness to a diverse patient population, including but not limited to diversity in gender, age, culture, race, religion, disabilities, and sexual orientation.
- Exhibit the highest moral and ethical standards in the care of patients and in their interactions with others.
- Work with other health professionals to establish and maintain a climate of mutual respect, dignity, diversity, ethical integrity, and trust.
- Demonstrate the ability to use self-awareness of knowledge, skills, physical and emotional limitations to engage in appropriate help-seeking behaviors.
- Demonstrate healthy coping mechanisms to respond to stress.
- Manage conflict between personal and professional responsibilities.
- Carry out professional and educational commitments in a professional manner.

**Tab 1** (Hight Ex. 4) at PLAINTIFF0000008-PLAINTIFF0000009; **Tab 2** (Arora Ex. 84) at UC0000013-UC0000014; **Tab 9** (Transcript of Deposition of Dr. Jeanne Farnan ("Farnan Dep. Tr.")) at 16:10-17:6, 18:8-19:3.

7. PSOM's program of studies provided that students would take classroom courses in their first and second years of the program (a/k/a the "preclinical biennium"); complete core and elective clerkships in their third year of the program; and complete clerkships, subinternships, and other experiences in the fourth year of the program (with the third and fourth years of the program also known as the "clinical biennium"). **Tab 1** (Hight Ex. 4) at PLAINTIFF0000010-

PLAINTIFF0000011, PLAINTIFF0000017, PLAINTIFF0000028; **Tab 2** (Arora Ex. 84) at UC0000015-UC0000016, UC0000021, UC0000033.

8. The PSOM curriculum leading to the Doctor of Medicine ("MD") degree was designed for completion in four years, but with approval of the Committee on Academic Promotions ("CAP"), students could take up to six years of academic enrollment to complete the program, limited to one additional year for the preclinical biennium and/or one additional year for the clinical biennium. **Tab 1** (Hight Ex. 4) at PLAINTIFF0000028; **Tab 2** (Arora Ex. 84) at UC0000033.

9. Extended study options included the Directed Study - Extended Curriculum Option ("ECO"), which permits students to take a decompressed course load and/or engage in remediation with the approval of the CAP. **Tab 1** (Hight Ex. 4) at PLAINTIFF0000028; **Tab 2** (Arora Ex. 84) at UC0000033.

10. The PSOM Academic Guidelines also explained that a student could take an official Leave of Absence with the approval of the CAP (or, in an emergency situation, the Dean for Medical Education or the Associate Dean for Medical Student Advising and Advancement) and included the following statements: "The maximum length of a Leave of Absence is one year. A second Leave of Absence will be considered only in the most exceptional circumstances. . . . Students petitioning to return from a medical Leave of Absence will generally require medical clearance from their treating physician(s). . . . The [CAP] may request additional documentation of readiness to return as appropriate." **Tab 1** (Hight Ex. 4) at PLAINTIFF0000029; **Tab 2** (Arora Ex. 84) at UC0000034.

11. Students could earn grades of Honors (H), High Pass (HP), Pass (P), or Failure (F) in their core clerkships, whereas all other courses and clerkships utilized a Pass/Fail grading system. **Tab**

**1** (Hight Ex. 4) at PLAINTIFF0000017; **Tab 2** (Arora Ex. 84) at UC0000021; *see also* **Tab 9** (Farnan Dep. Tr.) at 25:19-27:3.

12. Among the specific requirements for graduation from PSOM is the following: "Demonstrate professionalism and ethical conduct in all personal and professional actions and interactions, as determined by departments, medical school administration, and the Committee on Academic Promotions." **Tab** 1 (Hight Ex. 4) at PLAINTIFF0000016; **Tab 2** (Arora Ex. 84) at UC0000020.

13. The Academic Guidelines also included a section titled "Guiding Principles of Professionalism" that stated:

> A mark of a great medical school is the ability to create an environment which nurtures future physicians who possess knowledge of the most advanced scientific fundamentals and who demonstrate clinical competencies while behaving in ways that honor the profession of medicine. Helping students to achieve this level of professionalism is as important to a medical school as is its success in educating students in the biological and clinical sciences.

**Tab 1** (Hight Ex. 4) at PLAINTIFF0000032; **Tab 2** (Arora Ex. 84) at UC0000037.

14. The Guiding Principles of Professionalism include 27 "fundamental attributes" to which members of the PSOM community are required to "ascribe in [their] professional responsibilities, relationships, and ethics." **Tab 1** (Hight Ex. 4) at PLAINTIFF0000032-PLAINTIFF0000033; **Tab 2** (Arora Ex. 84) at UC0000037-UC0000038. Among these are the following "Professional Responsibilities":

- "Seek and accept feedback and constructive instruction from teachers, peers, residents and faculty in order to continually improve my educational experience, knowledge, and clinical skills."
- "Be accountable to all members of the Pritzker community, including students, residents, faculty, and support staff."
- "Admit to and assume responsibility for mistakes in a mature and honest manner and develop productive strategies for correcting them."

**Tab 1 (Hight Ex. 4)** at PLAINTIFF0000032; **Tab 2 (Arora Ex. 84)** at UC0000037.

15. These Guiding Principles also affirm that students, "[t]hrough [their] behaviors, . . . will demonstrate a commitment to honoring and upholding the expectations of the medical profession, and, in so doing, . . . will contribute to maintaining society's trust in it[,]" including by "[m]aintain[ing] the highest standards of academic and scholarly honesty throughout [their] medical education, by behaving in a trustworthy manner." **Tab 1** (Hight Ex. 4) at PLAINTIFF0000033; **Tab 2** (Arora Ex. 84) at UC0000038.

16. As stated in the 2022-2023 Academic Guidelines, a significant lapse in a student's professional behavior may result in a Professionalism Concern Report, or "PCR":

> Faculty or staff who observe a significant lapse in a student's professional behavior may notify a faculty dean, course or clerkship director. The faculty dean, course or clerkship director may choose to provide the student with feedback on their behavior directly. However, if the breach is significant enough they may report the situation to the Associate Dean for Undergraduate Medical Education and fill out a Professionalism Concern Report (PCR) form.
>
> . . .
>
> If a student accumulates more than two PCR forms and/or the Associate Dean for Medical Student Advising and Advancement observes a pattern of unprofessional behavior, or believes that a single incident represents an egregious lapse of professionalism they will meet directly with the student. After meeting with the student, they may refer the student to the Committee on Academic Promotions. The Committee may recommend remediation, placement on Monitored Academic Status or Academic Probation, or inclusion of the professionalism concerns in the student's MSPE. Recommendation for inclusion in the MSPE is made to the Dean for Medical Education, who would make the final decision about inclusion of the concerns in the MSPE. **Ultimately, the Committee on Academic Promotions has the authority to dismiss a student from medical school for academic reasons, including failure to demonstrate appropriate ethical or professional behavior.**

**Tab 1** (Hight Ex. 4) at PLAINTIFF0000033 (emphasis added).

17. PSOM's Academic Progress Committees ("APCs") were composed of the course and clerkship directors (with the Associate Dean for Medical Student Advising and Advancement

serving as the Chair of each APC) and were responsible for monitoring student progress and making recommendations to the CAP for monitoring, remediation, referral to learning specialists, Extended Curriculum Option, or other interventions. **Tab 1** (Hight Ex. 4) at PLAINTIFF0000021; **Tab 2** (Arora Ex. 84) at UC0000025.

18. The CAP was comprised of PSOM senior faculty members who are experienced with medical student education, was chaired by the Associate Dean for Medical Student Advising and Advancement, and was responsible for overall evaluation of student performance, determination of appropriate remediation for academic difficulty, and oversight of academic issues related to student retention and progress. **Tab 1** (Hight Ex. 4) at PLAINTIFF0000021; **Tab 2** (Arora Ex. 84) at UC0000025.

19. As stated in the Academic Guidelines:

> When evaluating student performance, the [CAP] takes into account such matters as fund of knowledge, ability to organize and logically present information, test-taking skills, understanding, judgment, and professional behavior. When a student is not performing adequately, the [CAP] will consider all relevant information. Students may be brought to the attention of the [CAP] through the [APCs] or through the Dean for Medical Education and their designees.

**Tab 1** (Hight Ex. 4) at PLAINTIFF0000021; **Tab 2** (Arora Ex. 84) at UC0000025.

20. As stated in the Academic Guidelines: "A student may be placed on Monitored Academic Status by the [CAP] if the student, in [the CAP's] sole judgment and discretion:

- Is at risk for failing to achieve satisfactory academic progress
- Is performing at a borderline level in one or more courses or clerkships
- Has failed to pass three or more exams in a given academic year
- Has received multiple Incomplete designations in courses or clerkships
- Demonstrates persistent professionalism concerns."

**Tab 1** (Hight Ex. 4) at PLAINTIFF0000024; **Tab 2** (Arora Ex. 84) at UC0000029.

21. As stated in the Academic Guidelines: "A student may be placed on Academic Probation by the [CAP] if the student, in [the CAP's] sole judgment and discretion:

- Is at risk for failing to achieve successful completion of the academic program
- Has failed one or more courses or clerkships
- Has failed to remediate concerns that led to being placed on Monitored Academic Status
- Has received multiple Professionalism Concern Reports
- Has engaged in unprofessional behavior that, in the [CAP's] judgment, calls into question the student's suitability to become a physician."

**Tab 1** (Hight Ex. 4) at PLAINTIFF0000025; **Tab 2** (Arora Ex. 84) at UC0000029.

22. As stated in the Academic Guidelines:

> **Ultimately, it is within the Committee's discretion to determine whether a student is permitted to continue at the school and whether any remediation of course work should be permitted or required. The Committee on Academic Promotions may consider the status of any student at any time, even if the academic record is satisfactory.** The Committee may, for reasons including but not limited to improper conduct, recommend to the Dean for Medical Education that a student be dismissed from the Pritzker School of Medicine.

**Tab 1** (Hight Ex. 4) at PLAINTIFF0000021 (emphasis added); **Tab 2** (Arora Ex. 84) at UC0000025 (emphasis added).

23. The Requirements for Advancement set forth in the Academic Guidelines stated in relevant part: "**Passing grades in individual courses are necessary but not alone sufficient for attainment of the MD degree from the Pritzker School of Medicine. Failure to demonstrate appropriate ethical or professional behavior may in itself be a cause for dismissal from the Pritzker School of Medicine despite passing academic performance**." **Tab 1** (Hight Ex. 4) at PLAINTIFF0000014 (emphasis added); **Tab 2** (Arora Ex. 84) at UC0000018 (emphasis added).

24. Plaintiff reviewed and understood the Requirements for Advancement set forth in the Academic Guidelines. **Tab 6** (Pl. Dep. Tr.) at 33:4-24.

25. As stated in the Academic Guidelines: "If, in the opinion of the Associate Dean for Medical Student Advising and Advancement, a decision that could affect a student's status or advancement . . . will be made at an upcoming meeting [of the CAP], the dean will meet with the student to notify them. The student will be informed that they may provide a written statement to the [CAP] in advance of the meeting. If submitted, the Associate Dean for Medical Student Advising and Advancement will present this to the [CAP]." **Tab 1** (Hight Ex. 4) at PLAINTIFF0000022; **Tab 2** (Arora Ex. 84) at UC0000026.

26. The Academic Guidelines set forth the following procedural guidelines for an appeal of a decision of the CAP:

1. A student appealing any academic decision beyond the departmental level, including decisions of the Committee on Academic Promotions, must make the request (in writing) to the Dean for Medical Education within three (3) weeks of the receipt of the written notification of the decision. The request should include the basis for the appeal as well as any relevant new information. Upon receipt of the written request, the Dean for Medical Education will be required to constitute an Academic Appeal Committee, which consists of the following:
    a. A minimum of five (5) senior faculty members including department chairs, committee chairs or section chiefs, and/or other senior faculty, preferably none of whom have been directly involved in the student's educational program.
    b. The medical student initiating the appeal may request that a medical student be added to the Committee. This student must be an upperclassman and will be chosen to serve by the Dean for Medical Education.
    c. The Dean for Medical Education (non-voting) and/or their designee.
2. The Academic Appeal Committee shall consider all pertinent materials, including any new information, and determine whether the Committee on Academic Promotions has rendered the appropriate decision. The appeal committee is not a legal proceeding and does not follow the procedures of a court of law.
3. The student may request to appear before the Academic Appeal Committee to answer questions or to present any new relevant information. This request will be granted unless the appearance would raise issues of safety for the committee members.

a. If and when the student appears before the Academic Appeal Committee, the student shall be allowed to select an advisor for assistance. If an advisor is to be present, the student must notify the Dean for Medical Education at the time a request for appeal is made. The advisor may not participate in the presentation or discussion.

4. The Academic Appeal Committee may request that the student appear before the committee to answer questions or to present any new relevant information.

   a. If and when the student appears before the Academic Appeal Committee, the student shall be allowed to select an advisor for assistance. If an advisor is to be present, the student must notify the Dean for Medical Education at the time a request for appeal is made. The advisor may not participate in the presentation or discussion.

5. The Academic Appeal Committee will review all pertinent material in the academic file of the student, including the letter of review and any additional supporting documentation that has been procured for the purpose of the hearing. The student shall have the right to inspect these documents. The procedure to be followed for the hearing will be:

   a. If and when the student appears before the Academic Appeal Committee, the student shall be allowed to select an advisor for assistance. If an advisor is to be present, the student must notify the Dean for Medical Education at the time a request for appeal is made. The advisor may not participate in the presentation or discussion.
   b. The Dean for Medical Education or their designee will present information from the Committee on Academic Promotions that led to the decision being contested by the student.
   c. New information from the student may be considered, at the discretion of the Academic Appeal Committee, but not if it could have been presented to the Committee on Academic Promotions at the time of its decision.
   d. If so decided by the Academic Appeal Committee, the student may be requested or permitted to appear before the committee. The student will leave the meeting at the conclusion of their presentation and after the committee's questions, if any, have been answered.
   e. The Academic Appeal Committee will be free to discuss the case in closed session.
   f. The Committee shall communicate a summary report of the proceedings, including the recommendation(s) of the Academic Appeal Committee to the Dean for Medical Education, who in turn will forward a final recommendation to the Dean of the Biological Sciences Division for approval.
   g. The Dean of the Biological Sciences Division will review the recommendations, make a final decision, and communicate with the student in question following the hearing. In the case of a dismissal, the Dean decides whether to uphold the recommendation or to select another alternative; either a notation of the dismissal is entered on the student's official University transcript, or a letter detailing the conditions of retention is sent to the student. The decision of the Dean is final.

**Tab 1** (Hight Ex. 4) at PLAINTIFF0000026-PLAINTIFF0000027; **Tab 2** (Arora Ex. 84) at UC0000031-UC0000032.

***B. PSOM's Student Treatment Policy***

27. PSOM's Student Treatment Policy includes the following Statement of Policy:

> The Pritzker School of Medicine at the University of Chicago is committed to maintaining an academic and clinical environment in which faculty, fellows, residents, students, nurses, and other medical staff work together freely to further education and research and provide the highest level of patient care, whether in the classroom, the laboratory, or the hospital, and clinics. The school's goal is to educate future physicians to meet high standards of professional behavior as outlined in the Pritzker School of Medicine's Guidelines of Professionalism [] and to practice in a learning environment where effective, humane, and compassionate patient care is demanded and expected.
>
> The school takes any mistreatment of students by residents, faculty, and medical center employees very seriously and has appointed two faculty members to serve as Ombudspersons [] to facilitate confidential reporting of potential mistreatment and to raise awareness of appropriate standards of behavior among members of the medical school community.

**Tab 3** (Hight Ex. 64) at UC0006353 (hyperlinks omitted).

28. Under the PSOM Student Treatment Policy, neither "bad teaching" nor an "attending giv-[ing a] student feedback on how to improve performance" is mistreatment. **Tab 3** (Hight Ex. 64) at UC0006354-UC0006356; **Tab 10** (Transcript of Deposition of Dr. James Woodruff ("Woodruff Dep. Tr.")) at 121:15-16; *see also* **Tab 6** (Pl. Dep. Tr.) at 333:1-15.

29. PSOM's Student Treatment Policy states the following regarding reporting mistreatment:

> **Reporting Mistreatment**
>
> Students are strongly encouraged to report Mistreatment using this online form []. Students with concerns about abusive conduct should contact the school's Ombudspersons [], any of the Pritzker faculty deans [], relevant faculty members (course director, preceptor or the department chair, etc.) or Director of Medical School Education []. Any of these individuals can discuss options with the student, offer guidance and support, and assist the student in attempting to resolve the matter informally. Every reasonable effort will be made to maintain confidentiality in such discussions.

> If informal resolution is unsuccessful or inappropriate, the student can file a formal complaint under the Pritzker School of Medicine's Grievance Policies[.]

**Tab 3** (Hight Ex. 64) at UC0006357 (hyperlinks omitted).

30. The Student Treatment Policy states that "[i]f informal resolution is unsuccessful or inappropriate, the student can file a formal complaint under the Pritzker School of Medicine's Grievance Policies," and includes the following statements regarding PSOM's Grievance Policies:

> 5) The University prohibits retaliation against any person who exercises any rights or responsibilities under this policy. Any act of retaliation may be a separate violation of this Policy.
>
> 6) A grade dispute or complaints about other academic evaluations may be evidence in support of a formal grievance but these complaints cannot constitute a formal grievance on their own. Pritzker students wishing to dispute grades or evaluations outside of a mistreatment context should refer to the Pritzker School of Medicine's Summary Evaluation or Course Grade Appeal Policy [].

**Tab 3** (Hight Ex. 64) at UC0006357, UC0006359 (hyperlinks omitted).

### *C. University Grievance Policy for Graduate Students*

31. The University Grievance Policy for Graduate Students ("Grievance Policy") is a University policy that establishes the procedures by which graduate students can report and "seek redress for actions that may constitute abuse of authority by University [] faculty, other academic appointees, postdoctoral researchers, or staff." **Tab 4** (Hight Ex. 77) at PLAINTIFF0000476.

32. The Grievance Policy includes a Statement of Non-Retaliation, which provides that "All members of the University community should be able to bring forward conflicts, concerns, and possible grievances in a respectful environment and are expected to do so in good faith. The University prohibits retaliation against any person who exercises their rights or responsibilities under this policy. Any act of retaliation may be a separate violation of this policy." **Tab 4** (Hight Ex. 77) at PLAINTIFF0000479.

## II. Plaintiff's Registration with Student Disability Services, and Related Policies

33. During the time that Plaintiff was a PSOM student, the University's Student Disability Services office ("SDS") administered the University's policies and procedures governing medical students' requests for accommodation, including reviewing disability accommodation requests, determining a student's eligibility for disability accommodations, and coordinating support services for students with disabilities. **Tab 11** (Transcript of Deposition of Charnessa Warren ("Warren Dep. Tr.")) at 6:5-14, 8:12-9:2, 18:12-19:1, 28:5-19.

34. As of 2018-2019, the procedures for students to seek a disability accommodation were outlined in the 2015-2016 Handbook for Graduate and Professional School Students with Disabilities ("SDS Handbook"). **Tab 11** (Warren Dep. Tr.) at 9:17-10:24, 12:21-14:20; *see also* **Tab 5** (SDS Handbook) (admitted to the record as Warren Ex. 86, *see* Tab 11 (Warren Dep. Tr.) at 13:12-14:20). Around 2020, SDS transitioned to hosting its policies and procedures on its website. **Tab 11** (Warren Dep. Tr.) at 11:8-12:4.

35. The SDS Handbook provides the exclusive process by which a student is to notify the University of a disability and make requests for reasonable accommodations for a disability, and that process continued to be in effect after SDS moved its policies to its website. **Tab 5** (Warren Ex. 86) at UC0006365; **Tab 11** (Warren Dep. Tr.) at 16:17-19:1, 35:11-36:20.

36. The SDS Handbook includes the following provisions regarding that process:

> **Notification of a Disability**
> A student must identify him/herself to Student Disability Services to begin the process of requesting accommodations. The University is not responsible for identifying students with disabilities or for contacting such students to begin the accommodation request process.
>
> **Request for Accommodations**
> Upon notification, Student Disability Services reviews with the student the documentation required to support the student's request for accommodations. It is in the best interest of the student to submit the documentation as soon as possible as the accommodation assessment may take up to ten (10) weeks. Requesting an

accommodation is an interactive process that requires the direct involvement of the student.

The process of determining eligibility and considering what is a reasonable modification (accommodation) is an interactive and collaborative process. Reasonable efforts are to be made both by the student requesting reasonable accommodation and the Student Disability Services to complete the disability determination process and the consideration of any reasonable academic modification expeditiously.

[…]

**Assessment of Documentation**

Student Disability Services assesses the student's documentation to ensure it conforms to University guidelines and, if approved, issues to the student along with Academic Services an Accommodation Determination Letter (ADL) outlining the accommodations. . . .

[…]

**Determination of Reasonable Accommodations and Modifications**

For Disability Services to provide reasonable accommodations and services, students with disabilities seeking these accommodations and services are required to provide current documentation of their disability.

To determine the appropriateness of particular academic modification Student Disability Services considers:

a. Functional limitations caused by the disability.
b. Essential requirements/elements of the academic program, course and University sponsored student life activity.
c. Past performance of the student with and without reasonable accommodation.
d. History of disability-related difficulties in participating in academic and University sponsored student life programs.
e. Previous modification(s) or adjustment(s) received by the student in an educational setting; and
f. Review of the recommended reasonable accommodation.

Reasonable accommodations are modifications that enable the student with a disability to have equal access to the student's educational program and student life activities for which the student is eligible. Modifications are not predetermined but, instead, are individualized based on the functional limitations caused by the student's disability, academic program requirements, and the student life activities. Moreover, reasonable accommodations are modifications (adjustments) to a course, program, service, job, activity, or facility that enables a qualified student with a disability to have an equal educational opportunity.

The reasonable accommodations do not lower or modify essential requirements nor do they fundamentally alter the nature of a service, program or

> activity, or result in undue financial or administrative burdens. If necessary, the Dean of Students (or his or her designee) will consult with course instructors to understand the essential requirements/elements of a particular course. The accommodations must be effective, but need not be state-of-the-art or ideal. Students may always contact Student Disability Services if approved accommodations are ineffective as a disability accommodation and if the nature of the disability changes.

**Tab 5** (Warren Ex. 86) at UC0006365-UC0006366.

37. When a request for one or more accommodations comes to SDS, SDS will assess the documentation provided by the student, determine whether the documentation is sufficient, and engage in the interactive process to identify any reasonable accommodations. **Tab 5** (Warren Ex. 86) at UC0006365-UC0006366; **Tab 11** (Warren Dep. Tr.) at 27:16-28:19, 33:7-34:2.

38. SDS has a practice to not grant accommodations that would apply retroactively and is likely to determine a request to be excused from professionalism or other essential program requirements or from disciplinary standards to be a fundamental alteration; all requests, however, are evaluated on their merits and a student may bring such a request to SDS for consideration. **Tab 5** (Warren Ex. 86) at UC0006366; **Tab 11** (Warren Dep. Tr.) at 23:8-19, 24:5-25:20, 26:20-27:6, 27:16-28:4, 36:21-38:21, 39:9-22, 40:1-12.

39. Plaintiff admits that students with accommodations still must comply with PSOM's professionalism standards. **Tab 6** (Pl. Dep. Tr.) at 307:2-6.

40. To request a medical leave of absence, students go through a medical leave of absence process that is managed within the student's academic division and that is separate from the process for requesting accommodations for a disability managed and overseen by SDS. **Tab 11** (Warren Dep. Tr.) at 21:18-22:20, 34:3-15, 40:13-41:6.

41. Plaintiff completed a "Student Request for Accommodations" form that he signed on June 20, 2018 and submitted before he started at PSOM, which (1) listed attention-deficit/hyperactivity disorder ("ADHD"), anxiety, and sickle cell anemia as his diagnoses/conditions because these

were the diagnoses/conditions that were relevant for the accommodations he needed; and (2) requested extra time on exams and "possibly" having a note taker for his courses as accommodations; he also testified that he asked if he could take his exams in a separate room even though that is not indicated on the form. **Tab 6** (Pl. Dep. Tr.) at 42:16-44:4, 45:3-46:19; **Tab 12** (Student Request for Accommodations) (admitted to the record as Hight Ex. 6, *see* Tab 6 (Pl. Dep. Tr.) at 42:16-43:17).

42. All of the accommodations Plaintiff requested, as identified in the preceding paragraph, and a separate testing location were granted and were helpful to him. **Tab 6** (Pl. Dep. Tr.) at 46:20-25, 47:1-49:15; **Tab 13** (Accommodation Determination Letter) (admitted to the record as Hight Ex. 7, *see* Tab 6 (Pl. Dep. Tr.) at 47:1-48:19), at PLAINTIFF0000531.

43. Plaintiff reviewed the SDS Handbook referenced in the Accommodation Determination Letter he received from SDS on July 16 or 17, 2018 and never contacted Dr. Warren with any questions about this letter or to request additional accommodations. **Tab 6** (Pl. Dep. Tr.) at 50:8-51:13; **Tab 13** (Hight Ex. 7) at PLAINTIFF0000531.

## III. Plaintiff's 2018-2019, 2019-2020, and 2020-2021 Academic Years, Academic Probation, and Leave of Absence

### *A. Plaintiff's M1 and M2 Years*

44. Although Plaintiff received grades of Pass for his M1 and M2 courses, all of which were graded on a Pass/Fail basis, he was considered to be a low performer in the Introduction to Medical Evidence course he took during his M1 year and in the Medical Neurobiology and Clinical Pathophysiology and Therapeutics I ("CPP & T") courses he took during his M2 year. **Tab 7** (Hight Ex. 19); **Tab 14** (Transcript of Deposition of Dr. Chelsea Dorsey, M.D. ("Dorsey Dep. Tr.")) at 16:3-22, 18:14-19:19; **Tab 15** (Declaration of Adam Cifu, M.D. ("Cifu Decl.")) at ¶ 7; **Tab 15-A** (April 2022 CAP Meeting Slides) (Cifu Decl. Ex. A) at UC0000510; *see also* **Tab 16**

**(**Declaration of Chelsea Dorsey, M.D. ("Dorsey Decl.")) at ¶ 11; **Tab 16-A** (CAP Meeting Slides July 14, 2023**)** (Dorsey Decl. Ex. A) at UC0000710.

45. Plaintiff was frequently discussed at the meetings of the APC for his year dating back to April 2019, at several other CAP meetings during the 2020-2021 and 2021-2022 academic years, and at every meeting of both the APC for his year and of the CAP that occurred during the 2022-2023 academic year. **Tab 16** (Dorsey Decl.) at ¶ 8.

46. The University made arrangements for Plaintiff to utilize the services of an external learning specialist who spent approximately 89 hours working with Plaintiff at a cost to the University of approximately $20,000.00. **Tab 17 (**Declaration of Korry Schwanz ("Schwanz Decl.")) at ¶¶ 8-10; **Tab 17-A** (Spreadsheet of LAS Coaching) (Schwanz Decl. Ex. A).

### *B. Beginning of Plaintiff's M3 Year, Unprofessional Conduct on Internal Medicine Clerkship, and Informal Report Regarding Resident*

47. Plaintiff began his M3 year, which is the first clerkship year, in the 2020-2021 academic year, but did not complete his M3 year until Spring 2023. **Tab 7** (Hight Ex. 19); **Tab 18** (May 1, 2023 Letter from Dr. Dorsey to Plaintiff) (admitted to the record as Hight Exhibit 27, *see* Tab 6 (Pl. Dep. Tr.) at 134:21-135:10).

48. While on the Internal Medicine clerkship in Autumn 2020, Plaintiff raised concerns regarding resident Dr. Jesse Drapekin, but ultimately did not submit a mistreatment report through PSOM's online reporting system or file a formal grievance regarding Dr. Drapekin. **Tab 10** (Woodruff Dep. Tr.) at 33:1-34:3, 38:1-39:4; **Tab 15** (Cifu Decl.) ¶¶ 8-9; **Tab 15-B** (Cifu Decl. Ex. B) at UC0005052-UC0005053. The Internal Medicine Clerkship Director, Dr. Amber Pincavage, provided feedback to the resident after the cardiology rotation concluded. **Tab 15** (Cifu Decl.) ¶¶ 8-9; **Tab 15-B** (Cifu Decl. Ex. B) at UC0005052-UC0005053.

49. That same resident informed Dr. Pincavage "that once [Plaintiff] used [an] intern note for one of his presentations as his own work when he didn't see one of the patients assigned to them." **Tab 15-B** (Cifu Decl. Ex. B) at UC0005052. Plaintiff has admitted that he used the intern's note as his own work in a presentation during the Internal Medicine clerkship. **Tab 19** (Plaintiff's Aug. 9, 2023 Appeal to the AAC) (admitted to the record as Hight Ex. 51, *see* Tab 6 (Pl. Dep. Tr.) at 268:4-269:3) at PLAINTIFF0000239-PLAINTIFF0000240; **Tab 6** (Pl. Dep. Tr.) at 234:11-21.

### *C. Pediatrics Clerkship, First Professionalism Concern Report, and Mistreatment Report Under Student Treatment Policy*

50. While on the Pediatrics clerkship in Autumn 2020 through Spring 2021, Plaintiff failed the Pediatrics shelf exam on his first attempt with testing accommodations in place, passed the shelf exam on his second attempt in April 2021, and received a grade of Pass for the Pediatrics clerkship. **Tab 20** (Transcript of Deposition of Dr. Nicola Orlov ("Orlov Dep. Tr.")) at 9:7-10:23, 32:16-33:5; **Tab 6** (Pl. Dep. Tr.) at 115:23-116:5, 305:1-306:12; **Tab 7** (Hight Ex. 19) at UC0000891; **Tab 21** (Pediatrics Grade Sheet) (admitted to the record as Orlov Ex. 99, *see* Tab 20 (Orlov Dep. Tr.) at 10:24-11:24) at UC0006444.

51. On December 7, 2020, two Pediatrics residents—Dr. Audrey Zeis and Dr. Robin So—reported to Dr. Orlov that they had significant concerns regarding Plaintiff's attendance and professionalism while on the Pediatrics clerkship. **Tab 20** (Orlov Dep. Tr.) at 12:13-13:14; **Tab 22** (December 2020 PCR) (admitted to the record as Hight Ex. 12, *see* Tab 6 (Pl. Dep. Tr.) at 89:17-90:14) at UC0000425-UC0000426; *see also* **Tab 6** (Pl. Dep. Tr.) at 81:23-84:4, 90:15-91:15.

52. Dr. Orlov met with Hight via Zoom on December 7, 2020 to discuss the residents' report, and following that discussion, Dr. Orlov determined that Plaintiff was "deceitful" with respect to his absences, including by (1) misrepresenting the length of his lecture period, for which he had

missed clerkship, as being from 12 to 3 pm on November 18, 2020 when in fact the lecture was only for one hour and he intended to use the remainder of the time to study on his own; (2) providing inconsistent explanations regarding the type of medical appointment he requested to leave early for on November 11, 2020; and (3) not giving timely notice of his symptoms and need for time away from training or timely scheduling a COVID test when he said he was ill, which resulted in Plaintiff being absent for several days; Dr. Orlov also noted that there was a "significant inconsistency" with respect to what Plaintiff had told the residents regarding the onset of his symptoms versus what he had told the Clerkship Directors about when he became ill. **Tab 20** (Orlov Dep. Tr.) at 14:10-15, 15:7-17:14, 20:13-21:3; **Tab 22** (Hight Ex. 12) at UC0000425-UC0000428; **Tab 6** (Pl. Dep. Tr.) at 81:23-83:13, 89:17-90:14, 91:16-92:9, 93:2-7, 93:20-95:24, 96:24-97:2, 98:11-18.

53. After meeting with Dr. Orlov on December 7, 2020, Plaintiff sent her at least eight emails that same day and stated in one such e-mail: "I did a poor job of planning things out, contacting the right people, making arrangements, and handling things in a professional manner. I should have contacted the clerkship director, I should have documented everything, and lastly I truly have been having personal issues and I've done a poor job of conveying those." **Tab 22** (Hight Ex. 12) at UC0000427; **Tab 6** (Pl. Dep. Tr.) at 100:7-101:4; **Tab 23** (Email from Plaintiff to Dr. Orlov) (admitted to the record as Hight Ex. 13, *see* Tab 6 (Pl. Dep. Tr.) at 100:7-15) at UC0005236; *see also* **Tab 6** (Pl. Dep. Tr.) at 98:11-18.

54. In another email Plaintiff sent to Dr. Orlov that night, he disclosed to Dr. Orlov that he had sickle cell anemia and said, "It is inappropriate to say that I was lying about my condition or experiences." **Tab 22** (Hight Ex. 12) at UC0000427. During their Zoom conversation, Dr. Orlov did not question Plaintiff's diagnosis, his pain, or the course of his illness, but rather thought he

was being deceitful about his missed clinical time, and she was clear that it was his responsibility to obtain approval to miss clinic time and to notify the clinical directors about any missed clinical time or any issues that arise. **Tab 6** (Pl. Dep. Tr.) at 96:25-98:18; **Tab 20** (Orlov Dep. Tr.) at 14:16-17:14, 21:4-14; **Tab 22** (Hight Ex. 12) at UC0000427-UC0000428.

55. Dr. Orlov sent Hight a PCR on December 18, 2020 that identified the following as unprofessional behaviors that Plaintiff engaged in during his Pediatrics clerkship: (1) fails to notify appropriate staff in a timely manner of absences; (2) fails to accept responsibility for own errors; and (3) behaves in a dishonest manner. **Tab 6** (Pl. Dep. Tr.) at 89:12-90:11; **Tab 22** (Hight Ex. 12) at UC0000421, UC0000423; **Tab 20** (Orlov Dep. Tr.) at 12:13-13:2; **Tab 6** (Pl. Dep. Tr.) at 110:21-111:2; **Tab 24** (Dec. 14, 2020 emails between Plaintiff and Dr. Orlov) (admitted to the record as Hight Ex. 14, *see* Tab 6 (Pl. Dep. Tr.) at 101:16-102:13) at PLAINTIFF0000445-PLAINTIFF0000446.

56. Plaintiff submitted a mistreatment report regarding Dr. Zeis on December 9, 2020, after which time he met with the Dean of Students, Dr. Woodruff, and informed Dr. Woodruff that his difficulties with Dr. Zeis were not mistreatment but said they were the result of poor communication and poor teaching. **Tab 6** (Pl. Dep. Tr.) at 102:14-103:10, 333:21-337:10; **Tab 25** (Mistreatment report regarding Dr. Zeis) (admitted to the record as Hight Ex. 65, *see* Tab 6 (Pl. Dep. Tr.) at 333:21-334:7) at UC0001769-UC0001771; **Tab 26** (Dec. 14, 2020 note by Dr. Woodruff) (admitted to the record as Hight Ex. 66, *see* Tab 6 (Pl. Dep. Tr.) at 334:22-335:6) at UC0003695; **Tab 10** (Woodruff Dep. Tr.) at 13:22-15:7.

57. After meeting with Dr. Woodruff about Plaintiff's report regarding Dr. Zeis on December 15, 2020, Dr. Orlov brought that feedback to Dr. Zeis's advisor who then met with Dr. Zeis to provide Dr. Zeis with feedback on creating an optimal learning climate especially around difficult

interpersonal interactions. **Tab 6** (Pl. Dep. Tr.) at 337:11-338:3; **Tab 27** (Dec. 15, 2020 note by Dr. Woodruff) (admitted to the record as Hight Ex. 67, *see* Tab 6 (Pl. Dep. Tr.) at 337:11-338:3) at UC0003694; **Tab 10** (Woodruff Dep. Tr.) at 15:10-16:5; **Tab 20** (Orlov Dep. Tr.) at 21:15-22:16.

58. Plaintiff did not inform Dr. Orlov that he had filed a mistreatment report regarding Dr. Zeis until after Dr. Orlov informed Plaintiff via email on December 14, 2020 that she would be submitting a PCR. **Tab 6** (Pl. Dep. Tr.) at 101:16-103:1; **Tab 24** (Hight Ex. 14) at PLAINTIFF0000445. Dr. Orlov's decision to file the PCR was not based on Plaintiff's report regarding Dr. Zeis. **Tab 20** (Orlov Dep. Tr.) at 19:5-20:12, 31:21-24.

### *D. Directed Study – Extended Curriculum Option, Failure of the OB/GYN Clerkship (2020-2021 Academic Year), and Informal Reports Regarding Resident and Attending*

59. Plaintiff submitted a petition to the CAP on January 5, 2021 to "tak[e] a leave of absence for personal reasons for the first two months of 2021" and then to do the Directed Study – Extended Curriculum Option ("ECO") after he returns from leave "to help prevent physical and mental burnout . . . due to the difficulties [he] faced as [he] progressed through the clerkships." **Tab 28** (January 5, 2021 petition to CAP) (admitted to the record as Hight Ex. 20, *see* Tab 6 (Pl. Dep. Tr.) at 117:20-118:6) at UC0004419; **Tab 6** (Pl. Dep. Tr.) at 117:25-118:20.

60. Then-Chair of CAP, Dr. Adam Cifu, sent Plaintiff a letter dated February 5, 2021 that stated:

> On Friday, January 22, 2021 the Committee on Academic Promotions met to review the progress of students.
>
> The Committee reviewed and approved your petition to change your enrollment status to Directed Study — Extended Curriculum Option (DS-ECO) effective Winter Quarter 2021. The Committee was made aware of your shelf exam failure in Pediatrics, as well as the [December 2020] Professionalism Concern Report submitted by [the co-directors of the Pediatrics clerkship] Drs. Alkureishi and Orlov. I informed the Committee of your intent to join the Pediatrics Clerkship on

> March 22, 2021 in order to complete the two weeks you have remaining on that clerkship and to then enroll in the Obstetrics-Gynecology clerkship on April 5, 2021. The Committee is aware that you plan to retake the Pediatrics shelf exam on April 2, 2021 with the Pediatrics Clerkship cohort you will be joining.
>
> I also shared with the Committee your intended plans for the rest of the year you will be on DS-ECO status: possibly research or remediation (if necessary) in May 2021; Psychiatry Clerkship, Neurology Clerkship, elective and interprofessional educational experiences in the clerkship block that begins June 14, 2021; USMLE Step 1 and research in Autumn Quarter 2021; return to full-time status Winter Quarter 2022 to complete the Surgery Clerkship.
>
> The committee supported the idea that you meet with Drs. Cifu and Vela before your return to clinical rotation in March to maximize the likelihood of success as they take the filing of a Professionalism Concern Report very seriously.
>
> The Committee asks that you submit quarterly updates prior to Committee on Academic Promotions meetings so they are aware of your progress. Please submit an update to Korry Schwanz (kschwanzl@bsd.uchicago.edu) by April 9, 2021 to ensure the Committee can review your progress at the spring meeting.
>
> The Committee asked that I express their best wishes to you while on DS-ECO. If there is anything that our office can do to assist you, do not hesitate to contact me [].

**Tab 6** (Pl. Dep. Tr.) at 119:25-121:3; **Tab 29** (February 5, 2021 letter from Dr. Cifu to Plaintiff) (admitted to the record as Hight Ex. 21, *see* Tab 6 (Pl. Dep. Tr.) at 119:25-120:10) at UC0000831. Plaintiff did not contact Dr. Cifu about this letter. **Tab 6** (Pl. Dep. Tr.) at 121:4-12.

61. Plaintiff admits that he was allowed to do the Extended Curriculum Option and that "it was very helpful." Tab 6 (Pl. Dep. Tr.) at 117:25-119:23.

62. Plaintiff failed the OB/GYN clerkship in 2021 after failing the OB/GYN shelf exam twice with test-related accommodations in place. **Tab 30** (Transcript of Deposition of Carrie Smith, M.D. ("Smith Dep. Tr.")) at 20:19-21:19; **Tab 7** (Hight Ex. 19) at UC0000890; **Tab 6** (Pl. Dep. Tr.) at 121:16-123:16. A student is required to repeat a clerkship if they fail that clerkship's shelf exam twice. **Tab 9** (Farnan Dep. Tr.) at 30:5-31:1.

63. Dr. Smith also shared the following concerns with then-Chair of the APC and CAP Dr. Cifu regarding Plaintiff's performance while Plaintiff was on the OB/GYN clerkship in Spring 2021: (1) Plaintiff's communication and interpersonal skills were less than professional; (2) Plaintiff did not have the typical clinical skills of an M3 student; (3) he arrived late to the operating room; and (4) he failed to assist with postoperative care. **Tab 31** (Synopsis of communications compiled by Dr. Smith) (admitted to the record as Smith Ex. 78, *see* Tab 30 (Smith Dep. Tr.) at 26:15-28:8, 29:6-10) at UC0001311-UC0001312; **Tab 32** (May 10, 2021 email from Dr. Smith to Dr. Cifu) (admitted to the record as Smith Ex. 82, *see* Tab 30 (Smith Dep. Tr.) at 98:14-99:2) at UC0005622; **Tab 30** (Smith Dep. Tr.) at 15:21-16:4, 18:15-20:4, 37:15-38:7, 96:12-97:1, 98:8-101:16.

### *E. Monitored Academic Status, Academic Probation and Leave of Absence*

64. After Plaintiff failed the OB/GYN shelf exam for the first time, Dr. Cifu, as then-chair of the CAP, informed Plaintiff by letter dated May 14, 2021 that Plaintiff was being placed on Monitored Academic Status (or "MAS"), which "indicates that there has been a history of academic challenges and that [Plaintiff's] primary focus should be on [his] academic achievement[.]" **Tab 6** (Pl. Dep. Tr.) at 121:16-122:20; **Tab 33** (May 14, 2021 letter from Dr. Cifu to Plaintiff) (admitted to the record as Hight Ex. 22, *see* Tab 6 (Pl. Dep. Tr.) at 121:13-22) at UC0000840.

65. Plaintiff was placed on Academic Probation after failing the OB/GYN shelf exam for a second time, and was notified of such in a letter dated August 2, 2021 from Dr. Cifu, as then-Chair of the CAP, which stated:

> On July 23, 2021, the Committee on Academic Promotions met to review the progress of students and petitions recently submitted for enrollment status changes.
>
> The Committee was made aware that you successfully remediated the pediatrics shelf examination and commends you for your success. The Committee was also

> made aware that you failed the OB/GYN shelf examination and subsequently failed your remediation attempt. Given these events in addition to your previous academic struggles, the Committee has decided to place you on Academic Probation. Academic Probation indicates that the Committee is concerned that you are at significant risk of failing to complete the academic program of the medical school. In addition to the need to focus fully on academic issues, as in the case of Monitored Academic Status, the student must meet regularly with the Associate Dean for Medical School Academics to ensure that appropriate progress is being made toward remediation of outstanding academic issues and requirements. A student who fails to pass a course or clerkship while on Academic Probation (including a grade of Incomplete) is subject to dismissal from medical school.
>
> After our conversation on Friday, July 23, I informed the Committee that you will be taking a medical leave of absence (LOA), effective immediately. They were supportive of your decision to focus on your health and wellbeing. Per the Academic Guidelines, the maximum time a student can spend on a leave of absence is one year. We ask that you send an update to Adam Eickmeyer (adambruce@bsd.uchicago.edu) by January 1, 2022; he will share that update with the Committee.
>
> The Committee asked that I send our best wishes as you take your leave of absence. We hope that the time will allow you to focus on centering your health and wellbeing and determining the best path forward for you. If there is anything that our office can do to assist you, do not hesitate to contact me [].

**Tab 6** (Pl. Dep. Tr.) at 123:20-125:3; **Tab 34** (August 2, 2021 letter from Dr. Cifu to Plaintiff) (admitted to the record as Hight Ex. 23, *see* Tab 6 (Pl. Dep. Tr.) at 123:17-25) at PLAINTIFF0000225. Plaintiff did not contact Dr. Cifu after receiving this letter. **Tab 6** (Pl. Dep. Tr.) at 125:16-126:1.

66. Plaintiff asked to take a leave of absence because he "felt very overwhelmed with his disabilities and [] needed time to recover" and because he was under "a lot of psychological stress" as a result of his grandmother having cancer. **Tab 6** (Pl. Dep. Tr.) at 124:24-125:15; **Tab 35** (Medical leave of absence application) (admitted to the record as Hight Ex. 24, *see* Tab 6 (Pl. Dep. Tr.) at 126:2-15) at UC0000837.

## IV. <u>Plaintiff's 2022-2023 Academic Year and Dismissal</u>

### *A. Return from Leave of Absence, Ongoing Professionalism Issues, and Bias Report Under Student Treatment Policy*

67. In his petition to return from his leave of absence as of June 13, 2022, which he signed on February 8, 2022, Plaintiff stated that he had "been able to find healthcare providers that have addressed [his] health concerns, and the time off [had] allowed [him] to recover mentally, physical [sic], and emotionally" and that he had "also prepared academically so [he] can do well once he return[s]" from leave. **Tab 36** (Plaintiff's request to return from leave of absence) (admitted to the record as Hight Ex. 25, *see* Tab 6 (Pl. Dep. Tr.) at 127:19-128:8) at UC0000828; **Tab 6** (Pl. Dep. Tr.) at 127:22-128:17.

68. In a letter to Plaintiff dated April 21, 2022, Dr. Cifu stated:

> On April 15, 2022 the Committee on Academic Promotions met to review the progress of students and petitions recently submitted for enrollment status changes.
>
> Thank you for providing an update; I shared it with the Committee at our meeting. They asked that I send our continued best wishes to you.
>
> The Committee approved your petition to return to full-time medical studies starting in the summer M3 quarter. They wanted to make sure you are aware that you've used three quarters of Directed Study-ECO and three quarters of a Leave of Absence during the clinical biennium; each has a maximum use of four quarters.
>
> We all wish you the best as you reintegrate into the curriculum. We understand that you will be taking OB/GYN, Surgery, Psychiatry, and the remainder of the triplet block. As a reminder, since you took OB/GYN and did not pass, your transcript will have a "Fail" designator for that quarter. You will have a second, separate, OB/GYN grade denoting what you earn when you eventually retake it.
>
> As a second reminder, when you resume your medical studies, you will remain on Academic Probation. Academic Probation indicates that the committee is concerned that you are at significant risk of failing to complete the academic program of the medical school. In addition to the need to focus fully on academic issues, as in the case of Monitored Academic Status, the student must meet regularly with the Associate Dean for Medical School Academics to ensure that appropriate progress is being made toward remediation of outstanding academic issues and requirements. A student who fails to pass a course or clerkship while on Academic Probation (including a grade of Incomplete) is subject to dismissal from medical school.

> We also understand that you have registered to take Step I of the USMLE exam this May and have received practice exam vouchers from [PSOM]. We think taking this exam is critical to keep you on track toward graduation and to prove that you have mastered the material required to be successful in medical school. We wish you the best as you continue preparing for the exam.
>
> Please let us know if there is anything our team can do to assist you as you prepare to return to the clerkship curriculum.

**Tab 37** (April 21, 2022 letter from Dr. Cifu to Plaintiff) (admitted to the record as Hight Ex. 26, *see* Tab 6 (Pl. Dep. Tr.) at 128:18-129:5); **Tab 6** (Pl. Dep. Tr.) at 128:23-129:16. Plaintiff did not contact Dr. Cifu regarding this letter. **Tab 6** (Pl. Dep. Tr.) at 133:4-14.

69. Plaintiff returned from his leave of absence on or about June 13, 2022, at the start of the Summer 2022 quarter, and was on a Directed Study – ECO year to remediate his OB/GYN clerkship and complete the rest of his third-year coursework. **Tab 36** (Hight Ex. 25) at UC0000828; **Tab 37** (Hight Ex. 26) at PLAINTIFF0000226; **Tab 18** (Hight Ex. 27) at PLAINTIFF0000232.

70. Plaintiff was discussed by the APC and the CAP at every meeting of the APC for his year and every CAP meeting during the 2022-2023 academic year. **Tab 16** (Dorsey Decl.) at ¶ 8; **Tab 16-E** (Dorsey Decl. Ex. E) at 17.

71. On October 10, 2022, Plaintiff filed a bias report through the mistreatment reporting system regarding interactions with Psychiatry resident Dr. John Lacci and Psychiatry intern Dr. Matt Milleman and checked the box on the report that says "Please do nothing with this information, except keep for your records." **Tab 6** (Pl. Dep. Tr.) at 338:4-339:22; **Tab 38** (October 10, 2022 bias report regarding Drs. Lacci & Milleman) (admitted to the record as Hight Ex. 68, *see* Tab 6 (Pl. Dep. Tr.) at 338:4-15) at UC0001772-UC0001775; **Tab 10** (Woodruff Dep. Tr.) at 35:3-13.

### ***B. Second Attempt at OB/GYN Clerkship, Informal Complaints about Evaluations, and Removal from Academic Probation to Monitored Academic Status***

72. Before Plaintiff started his second attempt at the OB/GYN clerkship in January of 2023, Dr. Smith granted Plaintiff's request to replace his night shift schedule with a day shift schedule after he informed Dr. Smith that he had "Bipolar 1 Disorder" because she did not think it would significantly alter Plaintiff's acquisition of skills and knowledge. **Tab 39** (October 5-12, 2022 emails between Dr. Smith and Plaintiff) (admitted to the record as Smith Ex. 79, *see* Tab 30 (Smith Dep. Tr.) at 46:7-47:13); **Tab 30** (Smith Dep. Tr.) at 45:14-48:18.

73. When Plaintiff repeated the OB/GYN clerkship in January and February of 2023, he successfully passed the shelf exam at this time and ultimately earned a grade of High Pass for the OB/GYN clerkship. **Tab 30** (Smith Dep. Tr.) at 22:11-24, 51:3-6; **Tab 6** (Pl. Dep. Tr.) at 141:16-21, 145:9-11.

74. An OB/GYN resident, Dr. Sydney Dautel, gave Plaintiff a mix of Passes and High Passes in her evaluation of him in the OB/GYN clerkship and included in her evaluation of him the following "professionalism comments": "Was on time 1 out of 2 days on the rotation. Followed through on tasks that were asked of him. Had sometimes read about the OR case prior to surgery. Did not introduce self to patient in preop." **Tab 40** (Dr. Dautel's evaluation of Plaintiff) (admitted to the record as Smith Ex. 80, *see* Tab 30 (Smith Dep. Tr.) at 90:20-92:17) at UC0001596-UC0001600.

75. After reviewing his evaluation from Dr. Dautel, Plaintiff sent Dr. Dautel an e-mail in February 2023 in which he stated in part:

> I don't agree with how critical you were in my evaluation especially considering that the expectations you had were incredibly high and not communicated to me. I don't believe that your appraisal of my performance was fair, and I'm rather disappointed that these things weren't brought up when I asked. I believe that some of what you commented on are out of the scope of what a third year medical student can do.

*See* **Tab 30** (Smith Dep. Tr.) at 53:11-20, 64:10-20, 90:20-92:14; **Tab 6** (Pl. Dep. Tr.) at 136:22-137:5, 143:13-145:8; **Tab 41** (February 5-6, 2023 email exchange between Plaintiff, Dr. Dautel, Dr. Smith, and Dr. Laveaux, as forwarded) (admitted to the record as Hight Ex. 30, *see* Tab 6 (Pl. Dep. Tr.) at 143:3-22) at UC0000437.

76. Dr. Smith informed Plaintiff that he should have come to the Clerkship Director, rather than going directly to the resident, with concerns regarding his evaluation, urged Plaintiff to strongly consider Dr. Dautel's feedback regarding his performance, and asked that Dr. Dautel reflect about where she could give feedback earlier in the process. **Tab 30** (Smith Dep. Tr.) at 65:24-67:1; **Tab 41** (Hight Ex. 30) at UC0000434-UC0000435.

77. Another OB/GYN resident, Dr. Meagan Brockman, gave Plaintiff a Pass in most categories of her evaluation of him in the OB/GYN clerkship and gave Plaintiff one High Pass. **Tab 42** (Dr. Brockman's evaluation of Plaintiff) (admitted to the record as Hight Ex. 29, *see* Tab 6 (Pl. Dep. Tr.) at 139:8-18) at UC0001590-UC0001594.

78. Also in February 2023, Plaintiff sent an email to Dr. Smith regarding the evaluation he received from Dr. Brockman, because he said he wanted more information about Dr. Brockman's evaluation of his performance, which he ultimately received after Dr. Smith went back to Dr. Brockman to obtain additional information. **Tab 6** (Pl. Dep. Tr.) at 136:9-137:18, 138:22-139:22, 141:22-142:3; **Tab 43** (Feb. 22, 2023 email exchange between Plaintiff and Dr. Smith) (admitted to the record as Hight Ex. 28, *see* Tab 6 at 136:6-14), at PLAINTIFF0000128-PLAINTIFF0000130. Plaintiff said he was pleased with this additional information. **Tab 6** (Pl. Dep. Tr.) at 142:4-143:2.

79. Plaintiff did not submit a mistreatment report through PSOM's online reporting system or file a formal grievance regarding Dr. Brockman or Dr. Dautel. **Tab 10** (Woodruff Dep. Tr.) at 33:11-34:3; **Tab 6** (Pl. Dep. Tr.) at 342:17-22.

80. In a letter to Plaintiff dated May 1, 2023, then-Chair of the CAP Dr. Chelsea Dorsey stated:

> On April 14, 2023 the Committee on Academic Promotions met to review the progress of students and petitions recently submitted for enrollment status changes.
>
> The Committee was reminded that you are on a Directed Study-ECO year to remediate the OB/GYN clerkship and complete the rest of your outstanding M3 coursework. I reminded the committee that you passed your OB/GYN rotation and were nearing the end of your ECO year before you rejoin as a fourth year student. Everyone sends their best regards as you finish up.
>
> Given your progress, the Committee has decided to take you off Academic Probation and place you back on Monitored Academic Status. Monitored Academic Status indicates that the committee is concerned about your academic progress but recognizes the improvement in your performance this year. In response to this we expect that your medical studies take precedent and extracurricular activities be minimized. In addition to the need to focus fully on academic issues, you must meet regularly with the Associate Dean for Medical Student Academic Advising and Advancement to ensure that appropriate progress continues to be made[.]
>
> If there is anything that our team can do to assist you, do not hesitate to contact me.

**Tab 18** (Hight Ex. 27) at PLAINTIFF0000232; **Tab 6** (Pl. Dep. Tr.) at 134:21-135:23. Plaintiff did not contact Dr. Dorsey about this letter. **Tab 6** (Pl. Dep. Tr.) at 135:24-136:5.

### ***C. The April 30, 2023 Email Incident***

81. In an email dated April 18, 2023, Plaintiff had asked his treating psychiatrist, University of Chicago Student Wellness Chief Psychiatrist Dr. David Berrier, if it would be possible to try Ambien (zolpidem) or Lunesta for insomnia. **Tab 6** (Pl. Dep. Tr.) at 62:6-9, 66:24-68:24; **Tab 44** (April 18-21, 2023 email exchange between Dr. Berrier and Hight) (admitted to the record as Hight Ex. 8, *see* Tab 6 (Pl. Dep. Tr.) at 66:24-67:10) at UCSW0000232. In response, Dr. Berrier noted his reluctance to prescribe a sleeping pill, but prescribed Plaintiff 20 pills of zolpidem (Ambien) 5 mg on April 21, 2023 for insomnia, directing him to use it sparingly. **Tab 6** (Pl. Dep. Tr.) at 61:6-

63:14, 67:5-68:24; **Tab 44** (Hight Ex. 8) at UCSW0000232; *see also* **Tab 45** (Plaintiff's Interrogatory Responses) (admitted to the record as Hight Ex. 3, *see* Tab 6 (Pl. Dep. Tr.) at 22:11-24:24) at 9 (interrogatory response no. 9).

82. At 5:43 a.m. on Sunday, April 30, 2023, Plaintiff sent an email to Dr. Brockman under the name of another PSOM student using the email address [REDACTED]@gmail.com. **Tab 6** (Pl. Dep. Tr.) at 145:15-149:15, 186:12-188:8, 210:10-211:11, 259:23-260:12; **Tab 46** (April 30-May 1, 2023 email exchange between Dr. Brockman and [REDACTED]@gmail.com) (admitted to the record as Hight Ex. 31, *see* Tab 6 (Pl. Dep. Tr.) at 145:15-146:14) at PLAINTIFF0000110-PLAINTIFF0000112. The other student's name was contained within the email address itself, as well as being signed to the bottom of the email. **Tab 46** (Hight Ex. 31) at PLAINTIFF0000110-PLAINTIFF0000111.

83. The email stated:

> Dear Meagan Brockman,
>
> I'm reaching out on behalf of my third year mentee and a few other medical students. We all recently had a discussion about which Ob/Gyn residents look out for us and those that either don't care, are unrealistically/unfairly strict, inequitable, jaded, or "punish" us with bad grades. This includes how kind they are when they evaluate us. There are some residents that truly do give us Honors while also being great people, and we love them for it vs those that don't. Your name came up several times with people saying that you grade us harshly. You also don't tell us why you gave us lower grades. Many students now have great stress and frustration with working with you and that we are afraid to ask you for an evaluation since it impacts our grades heavily. I'm not sure if your school was pass/fail or graded, but grades are very important to us. Im going into family med, but you gave me a poor eval which impacted my Ob/Gyn grade and ice comments for my MSPE. I hope you remember what it was like as a med student. Working as hard as you can to get Honors only to find out you got a terrible grade. Your colleagues who we consider wonderful are nice both personally and with them giving us Honors. It's a sense of relief and we can relax. We hope you understand how this impacts us, and we all always evaluate residents highly regardless of the circumstances. Mainly because we're all learning so why be super strict.... Giving people Honors does absolutely nothing to you, but helps a lot of med students. It's also what we think about when we select the outstanding resident awards. All of that being said, we beg and plead

> that you are much kinder when you evaluate medical students. Think about the position we're in and remember what it was like for you a few years ago. Especially since your colleagues are so nice to us when they grade us. Some even tell us they give people a all Honors and that's AMAZING from our end. Please don't be harsh and possibly a jaded resident that no one wants to work with. As a fellow trainee, I think we should uplift each other. I always give my residents great evals because at the end of the day metrics do matter and we want to support you. However, we don't care if you don't. Thank you for hearing our plea, and we hope you take this into account with future medical students because we don't like considering any of you residents as ("mean/harsh/unkind) just because they're really mean about their grades. The ones that care about our well being is very heartwrming to us. Grades that don't impact you! Please be kind and forgiving to us in an environment that's hard to adjust to :)
>
> Thank you for reading,
> [REDACTED]

**Tab 46** (Hight Ex. 31) at PLAINTIFF0000110-PLAINTIFF0000111 (errors in original).

84. Upon receipt of the above April 30, 2023 email from the account [REDACTED]@gmail.com, Dr. Brockman forwarded the email to Dr. Smith, Dr. Woodruff, and Dr. Farnan, who undertook an investigation which resulted in a determination that the email had been authored by Plaintiff. **Tab 30** (Smith Dep. Tr.) at 68:24-69:20, 70:7-8; **Tab 10** (Woodruff Dep. Tr.) at 67:23-69:24.

### *D. Dr. Woodruff's Interactions with Plaintiff Regarding the April 30, 2023 Email Incident*

85. Plaintiff received an email dated June 13, 2023 with a time stamp of 2:17 p.m. from Dean of Students Dr. James Woodruff, in which Dr. Woodruff requested a meeting with Plaintiff "as part of an investigation regarding falsification of identity and inappropriate email communications" relating to an email that a resident had received "that was not sent by the individual whose typed signature was on the email" and stated, "Such behaviors are in violation of University and Pritzker policies as they amount to falsification of documents and unprofessional behavior." **Tab 6** (Pl. Dep. Tr.) at 169:16-170:20; Tab 47 (June 13-14, 2023 emails between Dr.

Woodruff and Plaintiff) (admitted to the record as Hight Ex. 35, *see* Tab 6 (Pl. Dep. Tr.) at 169:16-21) at PLAINTIFF0000089.

86. On June 13, 2023 at 3:24 p.m., the April 30 email and Dr. Brockman's May 1, 2023 response to that email were forwarded from the [REDACTED]@gmail.com address to Plaintiff's significant other, Jacob Reynolds. Tab 6 (Pl. Dep. Tr.) at 154:3-158:15; Tab 46 (Hight Ex. 31) at PLAINTIFF0000109-PLAINTIFF0000111; *see also* Tab 48 (Transcript of Deposition of Jacob Reynolds ("Reynolds Dep. Tr.")) at 103:5-104:22.

87. On June 13, 2023 at 3:40 p.m., Plaintiff responded to Dr. Woodruff's email from 2:17 p.m. stating that he wanted to hear more about the situation described in Dr. Woodruff's email and asking if they could meet on Friday of that week. **Tab 6** (Pl. Dep. Tr.) at 170:21-174:15; **Tab 47** (Hight Ex. 35) at PLAINTIFF0000089.

88. After Hight and Dr. Woodruff met on Friday, June 16, 2023, Dr. Woodruff dictated notes of the meeting immediately thereafter, which state that Dr. Woodruff "spent the first part of the meeting reviewing the situation and presenting evidence to [Plaintiff]" demonstrating that Plaintiff had authored an email to Dr. Brockman on April 30, 2023 under the name of another student. **Tab 10** (Woodruff Dep. Tr.) at 14:9-15:7, 71:3-5, 73:5-74:1; **Tab 49** (Dr. Woodruff's notes of June 16, 2023 meeting) (admitted to the record as Hight Ex. 36, *see* Tab 6 (Pl. Dep. Tr.) at 177:13-25) at UC0003677.

89. Dr. Woodruff's June 16, 2023 meeting notes state that Plaintiff responded to the evidence as follows:

> Following review of the evidence with Robert, I asked him to respond to this evidence. I told him if he wanted time to think about it, I could give him the weekend.
>
> Robert chose to continue the conversation. Initially, he was noncommittal. He focused on his distress at the way our evaluation system works. He felt that it is

> subjective and unfair. He pointed out that he is not the only person in his class or in the school that is upset at the evaluation system. He is merely someone who is willing to bring his concerns to his evaluators. The goal is to learn as much as he can. He liked all his evaluators and holds nothing against them.
>
> He felt that many students are aware of Dr. Brockmans greeting practices. At a minimum they know because he had shared information about his experience with other students. Therefore, he is not the only one who could have targeted Dr. Brockman.
>
> At this point in the meeting, Robert seem to hesitate in knowing what to say, but eventually stated that he wrote the email. However, he was clear that he didn't send it.
>
> Through a series of pointed questions, Robert took responsibility for writing the email, discussing the email with his boyfriend, approving a plan for his boyfriend to send the email to Dr. Brockman, and providing his boyfriend with Dr. Brockman's email. Robert indicated he simply felt like he could not push the button himself.
>
> Robert subsequently provided context on this conversation. This interaction took place in the very early morning hours when Robert was not in the best emotional shape. When he wrote the text, he had not yet decided that this was more than a rumination. He often writes about these such challenges in his journal. He wrote it from the perspective of [redacted] as part of that rumination. It was only after he wrote it that the discussion took place about whether it should be sent.
>
> Robert spontaneously stated he felt it was wrong. I asked him to speak in more detail about what he thinks was wrong about this. He stated it was not appropriate for him to send the email, especially putting it on somebody else.

**Tab 49** (Hight Ex. 36) at UC0003678.

90. Dr. Woodruff's June 16, 2023 meeting notes also state, "I told him sanctions may ultimately range from some serious probation with the continuation of medical school to outright dismissal from medical school." **Tab 49** (Hight Ex. 36) at UC0003679.

91. Plaintiff did not tell Dr. Woodruff that he had taken zolpidem or that he did not remember the incident. *See* **Tab 10** (Woodruff Dep. Tr.) at 74:2-75:4; Tab 49 (Hight Ex. 36).

92. At his deposition on May 27, 2025, Hight testified that all he remembers about his meeting with Dr. Woodruff on Friday, June 16, 2023, about the April 30 email is Dr. Woodruff "discussing

the situation of this and how they thought it was me, and that he just said it's important to take accountability from the start" but he does not remember "like the specific details of anything." **Tab 6** (Pl. Dep. Tr.) at 174:17-181:9; *see also* **Tab 6** (Pl. Dep. Tr.) at 398:14-21.

93. After Dr. Woodruff told Plaintiff on June 20, 2023 that the matter would be considered by the CAP likely in mid-July and offered to help Plaintiff with a letter to the CAP "explaining his behavior and his aspirations going forward," Plaintiff sent a draft of his letter to the CAP to Dr. Woodruff on or about June 26, 2023. **Tab 10** (Woodruff Dep. Tr.) at 88:2-91:6; **Tab 50** (Dr. Woodruff's notes of June 20, 2023 call) (admitted to the record as Woodruff Ex. 94, *see* Tab 10 (Woodruff Dep. Tr.) at 88:1-89:5, 91:11-12) at UC0003684; **Tab 51** (June 27, 2023 email exchange) (admitted to the record as Hight Ex. 38, *see* Tab 6 (Pl. Dep. Tr.) at 203:25-206:7) at PLAINTIFF0000104; *see also* **Tab 10** (Woodruff Dep. Tr.) at 14:9-15:7.

94. In response, Plaintiff received an email from Dr. Woodruff dated June 27, 2023, in which Dr. Woodruff said that the request in Plaintiff's draft letter that the CAP not put him "on probation, attach this to [his] academic record, or include this on [his] [Medical Student Performance Evaluation ("MSPE")]" was "misguided" because, given Plaintiff's previous probation, the CAP would be asking themselves whether Plaintiff should remain in medical school and whether he should be a doctor. **Tab 51** (Hight Ex. 38) at PLAINTIFF0000104; **Tab 10** (Woodruff Dep. Tr.) at 91:1-10, 93:9-95:12; **Tab 6** (Pl. Dep. Tr.) at 204:14-206:7; *see also* **Tab 10** (Woodruff Dep. Tr.) at 105:3-19.

95. On July 3, 2023, Dr. Smith notified Plaintiff via email that she would be issuing a PCR for the April 30, 2023 email incident. **Tab 52** (July 3-5, 2023 emails between Dr. Smith and Plaintiff) (admitted to the record as Smith Ex. 81, *see* Tab 30 (Smith Dep. Tr.) at 93:9-95:13) at PLAINTIFF0007354-PLAINTIFF0007355; **Tab 53** (July 3-6, 2023 emails between Dr. Smith and

Plaintiff) (admitted to the record as Hight Ex. 42, *see* Tab 6 (Pl. Dep. Tr.) at 220:17-224:12) at PLAINTIFF0000119.

96. Dr. Smith testified that Plaintiff's conduct represented an "egregious" "professionalism concern that warranted a PCR." **Tab 30** (Smith Dep. Tr.) at 70:7-71:21, 94:12-95:10.

97. Plaintiff sent an email in response to Dr. Smith on July 4, 2023, in which he made no reference to zolpidem, and stated in part:

> Amid various personal and educational challenges, I found myself overwhelmed with emotions. The clinical year has been a rollercoaster ride, filled with victories and failures. It has given me a glimpse into the realities of being a physician rather than just a student. However, I now recognize that my choice was immature and misguided, and it was not an appropriate way to handle my emotions, especially at 5 AM.
>
> If I had approached the situation with logic rather than emotion, I would have realized that sending such an impulsive and thoughtless email was childish. Instead, I should have sought guidance from my mental healthcare team to process my feelings properly. Reflecting on it now, I am incredibly embarrassed and regretful, as I understand that my actions added no value to anyone's life and only became an unnecessary burden. Now everyone thinks poorly of me and my future endeavors, and I know no apology can atone for what has been done.
>
> […]
>
> It was not until Dr. Woodruff contacted and reminded me of the incident that I remembered the situation and felt ashamed.

**Tab 52** (Smith Ex. 81) at PLAINTIFF0007353-PLAINTIFF0007354; **Tab 53** (Hight Ex. 42) at PLAINTIFF0000118.

98. Plaintiff provided a response to the PCR on or about July 10, 2023 that contained no reference to zolpidem, in which he stated in part, "my decision was impulsive, self-implicating, thoughtless, and ultimately inappropriate, particularly in sending an email at 5 AM." **Tab 54** (July 3, 2023 PCR) (admitted to the record as Hight Ex. 43, *see* Tab 6 (Pl. Dep. Tr.) at 226:16-228:11) at PLAINTIFF0000069.

### *E. Plaintiff's Failure to Credit His Co-authors on an Abstract Submission*

99. At some point on or prior to July 11, 2023, Dr. Victoria Barbosa, a faculty member with whom Plaintiff had engaged in research, reported to Dr. Woodruff that she had spoken to Plaintiff in early May 2023 about his submission of an abstract to a conference without properly crediting the other authors who had been involved in the research, and without giving the coauthors an opportunity to review. **Tab 17-D** (July 12, 2023 email from Dr. Barbosa to Dr. Woodruff) (Schwanz Decl. Ex. D); **Tab 55** (Transcript of Deposition of Dr. Victoria Barbosa ("Barbosa Dep. Tr.")) at 16:19-21:6; **Tab 56** (July 11-12, 2023 emails between Dr. Woodruff and Dr. Barbosa) (admitted to the record as Woodruff Ex. 98, *see* Tab 10 (Woodruff Dep. Tr.) at 107:19-110:20) at UC0003666-UC0003667.

100. If Dr. Barbosa had known that there had been other professionalism concerns regarding Plaintiff, she would have spoken with Dr. Woodruff regarding whether or not this incident warranted a PCR. **Tab 55** (Barbosa Dep. Tr.) at 24:17-25:4.

101. At his deposition, Plaintiff testified that there was "an abstract situation with Dr. Barbosa where I thought that I was just going to be presenting an abstract. I didn't read it properly, I just put my name on it. But I had no intention to deceive or to claim credit for that abstract. I just thought it was will you be presenting it because I was going to be the one to present it." **Tab 6** (Pl. Dep. Tr.) at 233:20-234:2.

### *F. The CAP's Unanimous Recommendation that Plaintiff Be Dismissed*

102. The CAP that considered whether Plaintiff should be dismissed was comprised of seven voting members, all of whom were PSOM faculty members at that time. **Tab 14** (Dorsey Dep. Tr.) at 10:7-12:12. Dr. Dorsey served as the Chair, and Adam Eickmeyer, then the Director of Medical School Education, served in a non-voting administrative role. *Id.*

103. Plaintiff sent an email to CAP Chair Dr. Dorsey and Mr. Eickmeyer on July 5, 2023 which stated:

I wanted to share my reflection and thoughts about the incident involving emailing the resident inappropriately.

I sincerely apologize for the inconvenience and burden caused by my recent professional concern. As I reflect on the situation, I fully comprehend the gravity of the situation and the harm I have caused to those I have worked with, a friend, and all other parties involved. As a community, we have many other things that we should be doing for each other and the patients of the community. I deeply regret my actions and their potential to negatively impact my standing at Pritzker.

Amidst various personal and educational challenges, I was overwhelmed with emotions during the clinical year. It has been an emotional rollercoaster marked by triumphs and setbacks. This period of growth has provided me with a deeper understanding of the realities of being a physician beyond the role of a student. While these experiences have contributed to my personal and professional development, I now recognize that my decision was impulsive, self-implicating, thoughtless, and ultimately inappropriate, particularly in sending an email at 5 AM.

Looking back, I realize that taking a more thoughtful approach would have made me recognize my actions' hasty and immature nature. Instead, I should have sought guidance from my mental and physical healthcare team to manage my emotions properly. I am deeply embarrassed and remorseful, fully aware that my behavior held no value for anyone involved and only imposed an unnecessary burden. I am still learning as a developing physician, and this is an important and essential lesson learned, and I will never make any mistake like this again. I understand that no apology can fully rectify the damage caused by my actions, and I hope that our community won't think poorly of me forever because of my actions, and I have no right to ask for it. I want to contribute and keep our goal of having culturally competent, caring physicians who are patient care leaders.

Nonetheless, I am committed to addressing this matter sincerely and taking the necessary steps to improve myself and prepare for my future. I am actively working in close collaboration with my therapist, primary care doctor, and psychiatrist, and we have developed a comprehensive treatment plan to optimize my physical and mental health, so I can handle the intensity that occurs during residency. I am grateful for the care I have received, and I am prepared now more than ever to navigate any situation I encounter as a resident and a physician. Additionally, I have completed a course on medical professionalism, which has been a valuable learning experience, and I have attached the certificate below. These interventions and ongoing self-reflection will contribute to my development as a compassionate and responsible physician. I've also looked at the stories and mistakes that physicians have made that they regret, and the lessons learned from them also help solidify my ability to know what challenging situations can come up and how I can navigate them.

This experience taught me a profound lesson about professionalism's vital role in my future as a physician. While I used to believe professionalism primarily

> pertained to patient interactions, I now understand its significance in my relationships with colleagues both within and outside my professional responsibilities. This realization has become unequivocal to me. Given time, I hope to regain your faith and trust in my ability to represent Pritzker effectively and become an exceptional physician. I talked with my mom about this situation and was severely scolded for my actions. She said, "If you want something you'd say to me, then don't say it to everyone." Being away from family has been very hard for me since both of my grandmothers passed away while I worked as a medical student, but their passing is a reminder that I didn't work this hard just to cause issues.
>
> Once again, I offer my heartfelt apologies for my actions. I have grown significantly from this experience, and the lessons learned will undoubtedly have a lasting impact on all aspects of my life. I genuinely appreciate your understanding and consideration, and I hope you had an excellent 4th of July.

**Tab 57** (July 5, 2023 email from Plaintiff to Dr. Dorsey and Mr. Eickmeyer, with attached Letter to the CAP and Professionalism Certificate) (admitted to the record as Hight Ex. 41, *see* Tab 6 (Pl. Dep. Tr.) at 208:18-209:21) at UC0002266. Plaintiff's July 5, 2023 email makes no reference to zolpidem or to Plaintiff having taken zolpidem on the night of the April 30, 2023 email incident; nor does it state that Plaintiff had no memory of the incident. *See id.*

104. Plaintiff attached a letter to the CAP to his July 5, 2023 email. **Tab 57** (Hight Ex. 41) at UC0002268-UC0002271. His letter to the CAP stated:

> On April 30th, 2023, I composed an email to a resident posing as a former classmate. The email expressed my frustration towards the resident regarding an evaluation they submitted following my Ob/Gyn clerkship. First and foremost, I sincerely apologize for my actions and recognize that it was a complete and total lapse in judgment. While I did not intend to harm the resident, Dr. Brockman, or my former classmate, Dr. [REDACTED], I did not consider how my actions would impact them.
>
> My actions are unjustified, but I want to explain the situation and provide context as to how it happened. I completed my second Ob/Gyn clerkship in February 2023. The clerkship was a high-stakes and stressful period for me, as I previously failed the clerkship before taking a leave of absence to focus on my health. I felt more prepared this time, and the clerkship went exceedingly well. I finished the clerkship proud of my performance and how I strove to put in my best effort daily. My evaluations were largely positive and aligned with my expectations based on my performance. However, I was surprised at some of the feedback I received from two residents. I made a point to ask for verbal feedback during the rotation to

understand the expectations of my residents, and the feedback provided in these two evaluations did not correlate with the verbal feedback I received earlier. I emailed the two residents directly to ask for clarification. I received a thorough explanation from one resident and no response from Dr. Brockman. I contacted [Ob/Gyn clerkship director] Dr. Smith for insight into Dr. Brockman's evaluation. I received some explanation but never felt at peace with the situation.

Nearly two months went by, and the lack of closure regarding my performance was among the many factors that contributed to what I would consider one of my worst bouts of depression to date. My depression and distress revolved around the fact that I was going into my fourth year, and I felt like I would be an inadequate physician based on the feedback I received, despite trying my best. Moreover, I would compare myself with my classmates, who had excellent evaluations and shelf scores, and constantly ask myself how I could achieve the same level of success. I was already on academic probation for failing my Ob/Gyn shelf [exam] twice and my pediatrics shelf [exam], and I didn't want to feel inferior to those around me. I talked to my therapist at length about the difficulties I was experiencing during our appointments and different tools I could use to overcome these challenges more easily. She suggested having an emotional diary and writing all my thoughts and feelings about anything that bothered me. The journal would serve as an outlet to vent all my frustrations.

On April 30th, I couldn't sleep and thought writing in my emotional journal would be a good idea. I wrote about several things that evening, and one of the topics I chose to write about revolved around my Ob/Gyn experience. I wrote my thoughts in the journal and how I wished I could have engaged more with Dr. Brockman.

However, the actions I took when I decided to contact her were unprofessional and unethical. I created an email account under the name of my friend and former classmate, [redacted]. I thought my message would be more impactful if it came from someone else since I had already tried and failed to connect directly with Dr. Brockman. There was no particular motivation for choosing to pose as [redacted] aside from his name being the first to come to mind, nor was there a logical reason to include my birthday in the email address. I was not thinking correctly during that evening. I composed the email around 5 a.m. and was too afraid to send it. I read it over several times, and I had high hopes that Dr. Brockman would understand what I was expressing to her. After I included the text in the email, I had my boyfriend send it because I couldn't bring myself to do it. After he told me he had sent the email, I quickly came to regret it and realized I had made a colossal mistake. I had implicated an innocent party, [redacted], in my rash decision, and I will forever regret doing this and the harm I caused.

Several factors contributed to my emotional state leading up to this event, and I consider it one of my lowest points to date. During my clerkship, I had several ongoing personal issues with my family in Georgia. On January 17th, while I was on the Labor and Delivery portion of my Ob/Gyn rotation, my sister called me to

tell me that my grandma ("Nanny") had just had a massive stroke and had to be rushed to the hospital. The physicians told my family that the prognosis was grim, and I prayed that everything would be okay and that she would recover. However, on January 19th, Nanny passed. She was one of my most significant role models growing up and was integral to the person I am today. I made the tough decision to miss her wake and funeral to finish my Ob/Gyn clerkship as strongly as possible since I had just over a week left. I was afraid that taking time off would impact me negatively. I could not afford to jeopardize my grade or risk receiving an "incomplete" since I was already on academic probation. My grade ended up fine, but it was difficult to reconcile the complicated emotions of what had occurred. It was hard enough to get through the clerkship and even harder to accept that feedback often does not consider the silent, personal struggles we all experience.

This situation has been a significant learning experience for me, and I would like to address two of the biggest lessons:

- I was at one of my lowest points due to unforeseen circumstances. However, despite my hardships, professionalism should always be at the forefront. As someone responsible for patient care, I must constantly work to be the best version of myself, no matter what. I do not ever want my integrity or ethical principles to come into question because I hold these values very close to my heart.
- Feedback and evaluations that I receive are not always easy to digest. I have learned that feedback will be subjective, which is the evaluator's right. I will continuously receive feedback throughout my career from my peers, residents, attendings, and, most importantly, my patients. Rather than demand explanations, I should take feedback graciously and use it for improvement. Throughout my clerkship year, I actively sought feedback to become the best clinician I could be. Still, there is a proper way to do it, and I am committed to doing so professionally and courteously from this point forward. Ultimately, my only goal is to care for my patients in the best way possible.

Health challenges have been present for me throughout my life, and I know the rigors of residency will not make that any easier. I fervently overcome the challenges of my sickle cell anemia daily and am committed to doing the same for my mental health. Medicine requires a resilient person who can withstand challenges and adapt to circumstances, and I have been and will always remain resilient. I am actively taking the following steps to address the root causes of my anxiety and depression:

- I am meeting with my therapist at least once per week, and we are incorporating different cognitive and behavioral treatment modalities to address the root causes of my depression and anxiety. She is helping me process the emotions that have compounded over time, emphasizing how to manage grief when a loved one passes away and I cannot support my family.

- I am taking a much more hands-on approach to my therapy sessions to build vital coping skills to help me proactively handle stressors before they spiral out of control. After reflecting upon this experience, I have an even greater appreciation of how important it is to prevent my struggles from impacting my performance as an outstanding physician.

- I have set up a communication channel with my therapist to address acute issues that might arise outside my weekly sessions. If unavailable, I can schedule urgent and emergency virtual sessions with her or one of her practice partners.

- My psychiatrist, primary care physician, and therapist are working together to coordinate a treatment plan to support my physical and mental health issues and optimize my overall health, further strengthening my resiliency as I continue this rigorous career path.

I understand that addressing my health challenges promptly and effectively is incredibly important. The measures I am taking will tremendously help prepare me for the remainder of my fourth year and the many years of residency.

When people ask me why I am in medicine, I say without hesitation that it is because there is nothing else I can see myself doing. My passion for medicine is unwavering, and my actions and decisions have jeopardized this dream. It is a poor reflection on me that this situation occurred in the first place, especially considering my prior academic probation. The seriousness of this situation is not taken lightly, and I understand I have much work to do to prove that I am committed to addressing the cause of this situation and preventing any future missteps. I am forever grateful for the opportunities Pritzker has afforded me thus far. I am committed to representing Pritzker with pride as I continue toward graduation, residency, and a lifelong career as a physician.

My actions were unacceptable, and I have learned that my future demands nothing less than the highest ethical and honorable decision-making. This isolated incident has been formative and does not indicate the type of Pritzker graduate and future physician I aspire to be. Being a Pritzker student continues to be among the greatest honors of my life, and I look forward to putting this situation behind me. I have learned a valuable lesson from this experience, and I have become stronger because of it. I have a growth mindset as opposed to a fixed mindset. I understand an issue when it has happened and will move forward with an improved sense of judgment that will further my goal of becoming an outstanding physician. With great remorse, I kindly and humbly ask that you consider my apology and recognition of my wrongdoing in your evaluation of this situation. I thank you for your time spent reading this and hearing my reflection.

Respectfully,
Robert Hight

**Tab 57** (Hight Ex. 41) at UC0002268-UC0002271. Plaintiff's letter to the CAP makes no reference to zolpidem. *See id.*

105. Before the CAP met on July 14, 2023 to discuss Plaintiff's standing in PSOM, he understood that the CAP would be considering dismissal. **Tab 6** (Pl. Dep. Tr.) at 190:7-24. Plaintiff had a conversation with Dr. Dorsey on July 13, 2023 during which Dr. Dorsey "conveyed the seriousness of the committee's imminent deliberations" and informed Plaintiff that he would be up for dismissal at the July 14, 2023 CAP meeting. **Tab 6** (Pl. Dep. Tr.) at 190:7-24, 229:12-230:10; **Tab 58** (July 13-14, 2023 emails between Dr. Woodruff and Plaintiff, as forwarded) (admitted to the record as Hight Ex. 45, *see* Tab 6 (Pl. Dep. Tr.) at 229:12-19) at PLAINTIFF0000122-PLAINTIFF0000123; **Tab 16** (Dorsey Decl.) at ¶ 9.

106. Plaintiff testified at his deposition on May 27, 2025 that he remembers meeting with Dr. Dorsey on July 13, 2023 and "the one thing [he] remember[s] is her just saying that physicians require integrity," but he did not remember anything else about that conversation. **Tab 6** (Pl. Dep. Tr.) at 229:20-230:17.

107. Prior to the July 14, 2023 meeting of the CAP, Plaintiff had been discussed at every meeting of both the APC for his year and of the CAP that occurred during the 2022-2023 academic year. **Tab 16** (Dorsey Decl.) at ¶ 8.

108. At the July 14, 2023 meeting of the CAP, Dr. Dorsey presented the letter that Plaintiff had submitted to the CAP on July 5, 2023 and a slide presentation containing information about Plaintiff's academic performance across all academic years and details of his professionalism issues. **Tab 6** (Pl. Dep. Tr.) at 230:20-231:4; **Tab 59** (July 19, 2023 letter from Dr. Dorsey to Plaintiff) (admitted to the record as Hight Ex. 46, *see* Tab 6 (Pl. Dep. Tr.) at 230:20-231:4) at

PLAINTIFF0000420-PLAINTIFF0000421; **Tab 16** (Dorsey Decl.) at ¶ 11; *see also* **Tab 16-A** (CAP Meeting Slides July 14, 2023) (Dorsey Decl. Ex. A).

109. The CAP's review of Plaintiff's July 5, 2023 letter to the CAP led the CAP to believe that Plaintiff both dismissed the egregious nature of the April 30, 2023 email incident and appeared to disregard the other instances of unprofessional behavior that were discussed with him during his time in medical school. **Tab 16** (Dorsey Decl.) at ¶¶ 17-18; **Tab 16-E** (September 6, 2023 email and attached Final CAP Slides to the AAC) (Dorsey Decl. Ex. E) at 22.

110. Plaintiff was not present for the CAP's deliberations and has no personal knowledge of what was discussed by the CAP during the deliberations. **Tab 6** (Pl. Dep. Tr.) at 191:5-15.

111. After deliberating, the CAP unanimously voted to recommend that Plaintiff be dismissed. **Tab 16** (Dorsey Decl.) at ¶ 12.

112. Dr. Dorsey, as Chair of the CAP, sent Plaintiff a letter dated July 19, 2023 ("CAP Dismissal Letter") that stated as follows:

> The Committee on Academic Promotions met on July 14, 2023, to review the progress of all Pritzker students.
>
> During the meeting, the Committee reviewed your progress since its last meeting in April. The Committee reviewed new information surrounding the professionalism concern report (PCR) related to your impersonation of another medical student when you created a Gmail account and composed and sent an email to an OB/GYN resident posing as another medical student.
>
> The Committee also reviewed your academic performance and professionalism issues that have arisen during your time at Pritzker. The Committee considered that you had received a PCR from the pediatrics clerkship directors in 2020 for your dishonesty regarding absences during the clerkship. The Committee also considered the significant academic challenges that you experienced during your time as a medical student, most notably during the clerkship year but including the pre-clerkship years as well. The Committee additionally considered that you took time off on Directed Study — Extended Curriculum Option to decompress your clerkship year, and later that year started a leave of absence.

> I presented to the Committee the considerations and circumstances that you feel provide context for and explain your academic and professionalism challenges, which we have discussed at length. The Committee reviewed your 4-page letter addressed to the Committee. The Committee expressed great disappointment in your judgment and the fact that you have had other professionalism concerns documented during your time at Pritzker. They expressed serious concerns about your inability to meet the educational program's objectives and become a physician, especially as it relates to the bedrock requirement of professionalism, which informs your ability to be a trusted colleague and physician who always acts in the best interests of patients.
>
> In assessing your progress, the Committee found the following aspects of performance dispositive:
>
> - Repeated unprofessional behavior
> - The egregious nature of the most recent instance of unprofessional behavior involving the impersonation of another medical student
> - Unprofessional behavior while on Monitored Academic Status
> - Significant and sustained academic performance deficiencies
>
> The Committee thus concluded that you should not be permitted to continue in the medical program and unanimously recommended your dismissal from the Pritzker School of Medicine.
>
> Per the Academic Guidelines, you have the option to appeal a decision made by the Committee on Academic Promotions. Please refer to pages 25 and 26 of the most recent Academic Guidelines (2022-2023, linked in the header of this letter and attached to the email accompanying this letter) for the full procedural guidelines of the appeal process. Dr. Jim Woodruff, Pritzker's Dean of Students, can serve as a resource to walk through the appeals process should you desire that. Please note, a student appealing any academic decision beyond the departmental level, including decisions of the Committee on Academic Promotions, must make the request, in writing, to the Dean for Medical Education within three (3) weeks of the receipt of the written notification of the decision. If you wish to appeal, your intent must be submitted in writing to Dr. Vineet Arora, Dean for Medical Education, by August 9, 2023.
>
> I regret to share this news with you. If you have additional questions, please do not hesitate to contact me.

**Tab 59** (Hight Ex. 46) at PLAINTIFF0000420-PLAINTIFF0000421; *see also* **Tab 14** (Dorsey Dep. Tr.) at 26:5-13, 41:15-23; **Tab 16** (Dorsey Decl.) at ¶ 13; **Tab 6** (Pl. Dep. Tr.) at 230:20-231:4; **Tab 57** (Hight Ex. 41) at UC0002268-UC0002271.

113. With respect to "egregious nature of the most recent instance of unprofessional behavior involving the impersonation of another medical student" as a reason for dismissal identified by the CAP, Dr. Dorsey testified this was the "primary reason" the CAP recommended dismissal, and further testified:

> So consistently within the deliberations it came up that this was a really serious professionalism issue. And there was a high concern that this did not bode well for future patients that [Plaintiff] would potentially be serving. They were concerned about the safety of patients in the future, and they were concerned about how [Plaintiff] would interact with colleagues in the future. This was an instance it appeared where [Plaintiff] did not agree with the evaluations that were given to him by this ob-gyn resident, and this appeared to be his response to that. So again there was concern that this is the behavior that he would choose in the future if similar issues came up, or there was feedback given to him that he did not agree with.

**Tab 14** (Dorsey Dep. Tr.) at 39:3-40:8.

114. With regard to the "repeated unprofessional behavior" identified by the CAP as a reason for dismissal, Dr. Dorsey testified that Plaintiff "was consistently on the CAP's agenda for issues related to professionalism," "had two PCRs," had engaged in "dishonesty as it relates to an abstract submission," had an "episode during the [internal] medicine rotation," and professionalism issues had been raised at the meetings of the APC over the past year. **Tab 14** (Dorsey Dep. Tr.) at 41:24-44:1.

115. Dr. Dorsey further testified that "embedded within the discussions around [Plaintiff's] history of issues with professionalism, some of the documentation from those events revolve around an inability to take constructive criticism and to incorporate feedback" and a "pattern of behaviors over the course of multiple clerkships where there were multiple communications around evaluations and inability to take feedback," which the CAP considered because "professionalism is a huge part of" being a physician and a focus within the Guidelines, including

with respect to "being able to take constructive criticism and take feedback." **Tab 14** (Dorsey Dep. Tr.) at 46:10-24, 47:22-48:17, 53:4-54:22.

116. Dr. Dorsey testified that the most egregious of these professionalism issues was the April 30, 2023 email, which was "a demonstration of an inability to accept feedback" in that the email asked the resident "to give all students honors." **Tab 14** (Dorsey Dep. Tr.) at 55:4-22.

117. With regard to "unprofessional behavior while on Monitored Academic Status" as a reason for dismissal identified by the CAP, Dr. Dorsey testified that while Plaintiff was on Monitored Academic Status, the CAP was "still very concerned about him" even though he "had demonstrated some improvement in his academic performance over the prior two quarters," that it was a "big deal" that Plaintiff had come before the CAP with an "egregious professionalism issue" while on Monitored Academic Status, and that the "abstract issue" had also come up while Plaintiff was on Monitored Academic Status. **Tab 14** (Dorsey Dep. Tr.) at 41:24-45:9.

118. With respect to "significant and sustained academic performance deficiencies" as a reason for dismissal identified by the CAP, Dr. Dorsey testified that the CAP "consider[ed] [Plaintiff's] overall academic performance," further testifying:

> So for [Plaintiff] starting back for his first year, he was a low performer in one course, the medical evidence course. Moving on to the second year, he was noted to be a low performer in the neurobiology course as well as the CPP and T course, which is really one of the larger lecture-style courses that sets students up for their medical licensing exam as well as for their time on the wards during third year. So [Plaintiff] was noted to be a low performer in that course as well. There are three large exams, final exams, for that course. And on average he was the second lowest performer in his class. . . . During the 2020-2021 time frame, [Plaintiff] started his clinical years on the medicine rotation where he received a high pass. He then moved on to the pediatrics clerkship where he failed his first attempt at the final shelf exam, was able to remediate that, but received a pass on that clerkship. And then he began his ob-gyn clerkship, failed the first attempt at the final shelf exam, and failed the remediation of that exam as well, which means he failed the course. So yes, he was viewed as a low performer.

**Tab 14** (Dorsey Dep. Tr.) at 15:17-16:22, 20:19-21:1.

119. Plaintiff sent emails to Dr. Dorsey on August 2-3, 2023 in which he asked about the basis for the statement in the CAP Dismissal Letter that he had experienced "significant academic challenges" and about the instances of "repeated unprofessional behavior" that the CAP considered in reaching its decision, and in these emails, he made no reference to zolpidem or to having taken zolpidem on the night of April 30, 2023, and did not state that he had no memory of the incident or request that the CAP reconsider its decision. **Tab 6** (Pl. Dep. Tr.) at 262:19-264:1; **Tab 60** (August 2-3, 2023 emails between Dr. Dorsey and Plaintiff, as forwarded) (admitted to the record as Hight Ex. 47, *see* Tab 6 (Pl. Dep. Tr.) at 262:19-22) at PLAINTIFF0000113-PLAINTIFF0000116.

120. In response to Plaintiff's August 2-3, 2023 e-mails, Dr. Dorsey explained that Plaintiff was "noted to be a low performer in Introduction to Medical Evidence, Neurobiology, and CPP-T" and had "nearly the lowest average in the [CPP-T] class over the 3 exams" and explained the four instances of unprofessional behavior that the CAP had considered. **Tab 6** (Pl. Dep. Tr.) at 262:19-264:1; **Tab 60** (Hight Ex. 47) at PLAINTIFF0000113-PLAINTIFF0000116.

### *G. Plaintiff's Appeal and the AAC's Unanimous Recommendation to Uphold the CAP's Decision*

121. Plaintiff submitted a written appeal on August 9, 2023. **Tab 6** (Pl. Dep. Tr.) at 36:24-37:6; **Tab 59** (Hight Ex. 46) at PLAINTIFF0000420-PLAINTIFF0000421; **Tab 6** (Pl. Dep. Tr.) at 268:4-269:3; **Tab 19** (Hight Ex. 51) at PLAINTIFF0000233, PLAINTIFF0000236.

122. Dr. Arora, as Dean for Medical Education, selected the five senior faculty members on the AAC for Plaintiff's appeal—Drs. Peter Angelos, Tessa Balach, Stacy Levine, Christopher Sola-Olopade, and Jayant Pinto—and selected a senior medical student because Plaintiff asked that a student serve on the AAC. **Tab 8** (Arora Dep. Tr.) at 24:20-26:1; **Tab 6** (Pl. Dep. Tr.) at

274:1-7; *see also* **Tab 8** (Arora Dep. Tr.) at 21:14-20, 23:21-24:19; **Tab 61** (Declaration of Vineet Arora, M.D.) ("Arora Decl.")) at ¶ 3.

123. All six voting members of the AAC who considered Plaintiff's appeal signed the following statements certifying that they had read and agreed to abide by the following PSOM Conflict of Interest and Confidentiality Policy for students and faculty serving on the AAC:

> I. Conflict of Interest
> The Pritzker School of Medicine is committed to avoiding any actual or potential conflicts between its interests and any personal interest you may have as a member of the Academic Appeals Committee. Generally, conflicts arise when: (i) you serve as the physician for a student who is being discussed or (ii) you have a personal relationship with the student or the student's family.
>
> Disclosure thus is required, and abstention, recusal or removal is expected, whenever you may have an actual or potential conflict of interest.
>
> Ultimately, this Policy relies on your sound judgment. Recognizing that it is difficult to anticipate all potential conflicts in advance, we remind you that questions regarding this Policy may be raised informally and at any time with the Associate Dean for Medical Student Academic Advising and Advancement or the Dean for Medical Education.
>
> II. Confidentiality
> As a member of the Academic Appeals Committee, you will have access to information about students that is confidential by law and University policy. In addition, you will be a part of discussions in which colleagues will express opinions that they fully expect to be kept in confidence. In all cases, transgressions of confidence threaten the integrity of the academic process and weaken our ability to exercise our most informed and therefore best judgments and advice.
>
> You may find yourself in the awkward situation that arises when someone not on the committee seeks information from you about a medical student who has been discussed by a committee on which you serve. However, the cardinal principle of confidentiality mandates that you not divulge the content or nature of committee discussion to the student or to any third party, including parents, relatives, other students, colleagues, friends and acquaintances.

**Tab 62** (AAC Conflict of Interest and Confidentiality Policy statements) (admitted to the record as Arora Ex. 85, *see* Tab 8 (Arora Dep. Tr.) at 31:9-32:5) at UC0006375-UC0006382.

124. None of the AAC members who considered Plaintiff's appeal identified any conflict of interest. **Tab 62** (Arora Ex. 85) at UC0006375-UC0006382.

125. In his written appeal, Plaintiff asked for his dismissal to be reversed or undone and to be reinstated with the treatment plan described in his appeal as an accommodation. **Tab 6** (Pl. Dep. Tr.) at 268:4-269:3, 270:13-271:2, 271:13-22, 279:21-280:11; **Tab 19** (Hight Ex. 51) at 21.

126. For the first time, Plaintiff stated in his written appeal:

> Medication changes occurred around the event, resulting in sleep irregularities and mood instability, possibly due to an episode of acute mania or the new medication I started which was Zolpidem.
> […]
> I was prescribed Zolpidem on April 21st, 2023, roughly one week prior to the incident. This medication was new to me then and was taken in the days surrounding the email incident. . . . This sheds light on the uncharacteristic nature of my actions and the fact that I have a vague recollection of the incident and its details or why I did it in the first place.

**Tab 19** (Hight Ex. 51) at PLAINTIFF0000238-PLAINTIFF0000239; **Tab 6** (Pl. Dep. Tr.) at 192:19-193:1, 268:4-270:7.

127. Plaintiff was in therapy the entire time he was a student at PSOM, and the "treatment plan" Plaintiff identified in his written appeal to the AAC contained a list of medical and mental health providers whom he had already been seeing prior to submitting his appeal. **Tab 6** (Pl. Dep. Tr.) at 110:16-20, 270:13-271:2; **Tab 19 (**Hight Ex. 51) at PLAINTIFF0000255-PLAINTIFF0000256, PLAINTIFF0000258-PLAINTIFF0000262; **Tab 45 (**Hight Ex. 3) at 4-8 (response to interrogatories 5 & 6).

128. In an email dated August 18, 2023, Dr. Arora informed Plaintiff of his right to have an advisor, who at the time was Dr. Sonia Oyola, present at the meeting of the AAC and informed him that a final decision would not be rendered until the AAC had the opportunity to deliberate and make a recommendation to the Dean who reviews the case and communicates the final

decision to Plaintiff. **Tab 6** (Pl. Dep. Tr.) at 283:25-284:8; **Tab 63** (August 17-18, 2023 emails between Plaintiff, Dr. Arora, and Dr. Woodruff) (admitted to the record as Hight Ex. 52, *see* Tab 6 (Pl. Dep. Tr.) at 283:12-24) at PLAINTIFF0008698.

129. In response to Plaintiff's appeal, Dr. Dorsey and Mr. Eickmeyer prepared a written response that explained the basis for the CAP's recommendation that Plaintiff be dismissed. **Tab 64** (Academic Appeal Case Document) (admitted to the record as Hight Ex. 55, *see* Tab 6 (Pl. Dep. Tr.) at 287:13-289:11) at PLAINTIFF0000413-PLAINTIFF0000417; **Tab 14** (Dorsey Dep. Tr.) at 51:22-52:10; **Tab 16** (Dorsey Decl.) at ¶¶ 14-15.

130. On August 30, 2023, Mr. Eickmeyer sent the AAC members a packet of materials (referred to herein as the "Academic Appeal Case Document") that included (1) background information about the relevant committees and processes, (2) a timeline of Plaintiff's academic and professionalism history with PSOM, (3) the core part of Plaintiff's appeal (*i.e.*, the 22-page letter to the AAC) (with additional supplemental information that Plaintiff provided in support of his appeal available at a hyperlink to a Box folder), and (4) a response to Plaintiff's appeal and additional context for the CAP's decision that was the subject of the appeal prepared by Dr. Dorsey and Mr. Eickmeyer. **Tab 64** (Hight Ex. 55) at PLAINTIFF0000384-PLAINTIFF0000417; **Tab 17** (Schwanz Decl.) at ¶¶ 12, 22; **Tab 17-B** (Academic Appeal Case Document) (Schwanz Decl. Ex. B); **Tab 17-K** (August 30-September 5, 2023 emails from Mr. Eickmeyer to AAC, Dr. Arora, and Ms. Schwanz) (Schwanz Decl. Ex. K).

131. The documents hyperlinked in the Academic Appeal Case Document were stored and could be accessed in an electronic Box folder that contained the following documents as of August 30, 2023:

- Dr. Cifu's notes of meeting with Plaintiff (**Tab 17-C** (Schwanz Decl. Ex. C))
- Plaintiff's PSOM clerkship evaluations (**Tab 17-E** (Schwanz Decl. Ex. E))

- Excerpted and de-identified comments from Plaintiff's clerkship evaluations (**Tab 17-F** (Schwanz Decl. Ex. F))
- Synopsis of feedback on Plaintiff's OB/GYN rotation at North Shore (**Tab 17-G** (Schwanz Decl. Ex. G))
- Dr. Farnan's investigation report, with supporting documentation (**Tab 17-H** (Schwanz Decl. Ex. H))
- Email received by Dr. Brockman on April 30, 2023, as forwarded to Dr. Farnan, Dr. Woodruff, and Dr. Smith (**Tab 17-I** (Schwanz Decl. Ex. I))
- Dr. Woodruff's agenda for the June 16, 2023 meeting with Plaintiff (**Tab 17-J** (Schwanz Decl. Ex. J))
- Notes from the June 16, 2023 meeting between Dr. Woodruff and Plaintiff (**Tab 49** (Hight Ex. 36))
- PCR issued to Plaintiff by Dr. Smith on July 3, 2023 (**Tab 54** (Hight Ex. 43))
- Plaintiff's letter to the CAP (**Tab 57** (Hight Ex. 41) at UC0002268–UC0002271)
- Medical professionalism certificate provided by Plaintiff to the CAP (**Tab 57 (**Hight Ex. 41) at UC0002272)
- PCR issued to Plaintiff by Dr. Orlov (**Tab 22** (Hight Exhibit 12))
- Plaintiff's email to Dr. Smith regarding Dr. Brockman's evaluation (**Tab 43** (Hight Ex. 28))
- Plaintiff's email to Dr. Dautel regarding her evaluation (**Tab 41** (Hight Ex. 30))
- Plaintiff's Appeal to the AAC (**Tab 19** (Hight Ex. 51))
- Email from Dr. Barbosa to Dr. Woodruff regarding Plaintiff's abstract submission (**Tab 17-D** (Schwanz Decl. Ex. D))
- CAP's July 19, 2023 Letter to Plaintiff recommending dismissal (**Tab 59** (Hight Ex. 46)).

**Tab 17** (Schwanz Decl.) at ¶¶ 13-22.

132. Mr. Eickmeyer, copying Dr. Arora, sent Plaintiff an email from Dr. Arora on August 30, 2023 that included the Academic Appeal Case Document and access to the documents in the electronic Box folder, which the AAC members received that same day as described in SOF 130-131 above. **Tab 65** (August 30, 2023 email from Mr. Eickmeyer to Plaintiff) (admitted to the record as Hight Ex. 53, *see* Tab 6 (Pl. Dep. Tr.) at 284:19-285:18) at PLAINTIFF0008989; **Tab 17** (Schwanz Decl.) at ¶¶ 22-23; *see also* **Tab 64** (Hight Ex. 55) at PLAINTIFF0000384-PLAINTIFF0000417; **Tab 17-B** (Schwanz Decl. Ex. B).

133. In that same email, Dr. Arora asked Plaintiff to let her know if he would like to have an advisor other than Dr. Oyola attend the September 6, 2023 AAC meeting with him given that Dr.

Oyola appeared to be out of town, but Plaintiff did not select another advisor. **Tab 6** (Pl. Dep. Tr.) at 284:19-285:18, 287:14-16; **Tab 65** (Hight Ex. 53) at PLAINTIFF0008989.

134. Mr. Eickmeyer also sent Plaintiff a link with access to the electronic Box folder on August 30, 2023 that contained all of the documents identified in SOF 131 above. **Tab 66** (August 30, 2023 email from Mr. Eickmeyer via noreply@box.com to Plaintiff) (admitted to the record as Hight Ex. 54, *see* Tab 6 (Pl. Dep. Tr.) at 287:17-289:12) at PLAINTIFF0000426-PLAINTIFF0000427; **Tab 17** (Schwanz Decl.) at ¶ 13.

135. Dr. Arora convened and attended the meeting of the AAC held on September 6, 2023 to consider Plaintiff's appeal. **Tab 8** (Arora Dep. Tr.) at 26:2-10, 38:7-11; **Tab 61** (Arora Decl.) at ¶¶ 2, 4.

136. The AAC first heard from Dr. Dorsey, who prepared and presented slides summarizing the CAP's decision to recommend that Plaintiff be dismissed. **Tab 8** (Arora Dep. Tr.) at 38:12-39:1; **Tab 16 (**Dorsey Decl.) at ¶¶ 16-18; **Tab 16-E** (Dorsey Decl. Ex. E).

137. Because Plaintiff had asked to appear before the AAC and the AAC had granted that request, the AAC then asked to hear from Plaintiff and allotted approximately 45 minutes for Plaintiff to make a presentation to the AAC and for the AAC to ask Plaintiff any questions it had. **Tab 8** (Arora Dep. Tr.) at 39:9-14, 40:4-10; **Tab 6** (Pl. Dep. Tr.) at 273:23-274:7; *see also* **Tab 2** (Arora Ex. 84) at UC0000031-UC0000032; **Tab 61** (Arora Decl.) at ¶ 4.

138. On September 6, 2023, Plaintiff appeared in-person before the AAC, provided copies of a written statement, and addressed questions from members of the AAC. **Tab 61** (Arora Decl.) at ¶ 4; **Tab 61-A** (Plaintiff's Written Statement to the AAC) (Arora Decl. Ex. A); **Tab 67** (Plaintiff's Written Statement to the AAC) (admitted to the record as Hight Ex. 57, *see* Tab 6 (Pl. Dep. Tr.) at 290:10-292:3).

139. Plaintiff testified that the AAC asked him questions, including why the April 30, 2023 email incident happened, but he does not recall exactly what questions the AAC asked him. **Tab 6** (Pl. Dep. Tr.) at 202:8-203:11, 278:15-279:8, 289:18-290:9.

140. Rather than listen to Plaintiff read his written statement or recite information from it, the AAC had specific questions from the materials the AAC members had reviewed to ask Plaintiff during the time that had been allotted for Plaintiff to be before the AAC, including asking him to define professionalism, to reflect on the April 30, 2023 email incident and what he had done to take responsibility, and how he would prevent such things from happening in the future. **Tab 8** (Arora Dep. Tr.) at 40:11-18; 43:11-44:17; **Tab 61** (Arora Decl.) at ¶ 4.

141. The AAC then deliberated in closed session without Plaintiff present, considered all of the documentation provided to the AAC, and reached a unanimous decision to recommend to Dean of the Division of the Biological Sciences and PSOM Dr. Mark Anderson ("Dean Anderson"), that the decision of the CAP be upheld. **Tab 8** (Arora Dep. Tr.) at 46:9-15; **Tab 6** (Pl. Dep. Tr.) at 193:12-15, 297:24-298:2; **Tab 61** (Arora Decl.) at ¶ 5; **Tab 68** (September 11, 2023 email from Dr. Arora to Dr. Anderson and attached AAC memorandum) (admitted to the record as Hight Ex. 59, *see* Tab 6 (Pl. Dep. Tr.) at 296:9-13) at UC0003345.

142. The five-page memorandum dated September 11, 2023 from the members of the AAC to Dr. Arora (the "AAC's September 11, 2023 Memorandum") accurately summarized the deliberations of the AAC that resulted in its recommendation to uphold the decision of the CAP, including the following list of observations and concerns that the AAC voiced in arriving at its decision:

- "[Plaintiff] had previously received a high level of support, guidance, and latitude from the Committee on Academic Promotions and from the medical school. This includes being granted multiple opportunities to step out of the curriculum (on Directed Study and Leave of Absence) for over a year. They noted the level of

commitment shown to [Plaintiff] by the medical school but did not feel that [Plaintiff] reciprocated that commitment in his actions.

- The Committee on Academic Promotions' decision to dismiss [Plaintiff] from the medical school was based on an apparent pattern of academic performance deficiencies and unprofessional behavior.

- [Plaintiff's] unprofessional behaviors occurred with many "guard rails" in place by the medical school. They expressed concern at how [Plaintiff] would behave in the future when caring for patients and working on a team, when many of these guard rails would no longer be present.

- Impersonating a colleague via email would be cause for great concern--and likely disciplinary action--for even a seasoned faculty member.

- While the introduction of zolpidem as a rationale for sending the e-mail was theoretically possible, [the AAC] still felt that this was not enough to explain his track record of unprofessional behavior when he was not taking this medication. Another major issue is that [Plaintiff's] response to the incident, regardless of the cause, was considered [by the AAC to be] unsatisfactory, especially given the gravity of the situation and potential harm to others.

- [Plaintiff's] interview with the [AAC] did not give sufficient indication [to the AAC] that he understood professionalism (and its special importance in medicine), appreciated the gravity of his track record, or demonstrated a willingness to take full responsibility for his unprofessional behaviors and the people affected by those behaviors, regardless of cause or context. Ultimately it was felt he is unable to meet the standards expected of a [PSOM] student.

- The [AAC] agreed with [Plaintiff] that his mental health challenges appeared to be very significant and that addressing those challenges should be his focus. However, the [AAC] found no evidence based on the material submitted or in [Plaintiff's] statement & interview to alter the [CAP's] determination that [Plaintiff] would [not] be successful in the medical school education program. The [AAC] did not believe that [Plaintiff] had demonstrated significant progress over the period reviewed and was highly concerned that the pattern of unprofessional behavior that he demonstrated repeatedly while under stress was an indication that he could not function and care for patients in the stressful environments in which he would undoubtedly find himself if he were to continue pursuing a career in medicine."

**Tab 68** (Hight Ex. 59) at UC0003345-UC0003346; **Tab 8** (Arora Dep. Tr.) at 42:13-43:10, 136:3-138:4.

143. Dr. Arora forwarded a copy of the AAC's September 11, 2023 memorandum to Dean Anderson. **Tab 8** (Arora Dep. Tr.) at 128:11-23; 129:22-131:8, 132:3-133:8; **Tab 68** (Hight Ex. 59) at UC0003341.

### *H. Dean Anderson's Final Decision to Dismiss Plaintiff*

144. Before making his decision, Dean Anderson reviewed a slide deck that summarized the CAP's decision to recommend dismissal, the Academic Appeal Case Document that included Plaintiff's letter to the AAC, and the AAC's September 11, 2023 Memorandum. **Tab 69** (Transcript of Deposition of Dr. Mark Anderson ("Anderson Dep. Tr.")) at 10:15-11:3, 11:15-12:4, 14:4-16:10; *see also* **Tab 70** (CAP Slides to the AAC, as provided to Dr. Anderson) (admitted to the record as Anderson Ex. 107, *see* Tab 69 (Anderson Dep. Tr.) at 24:11-20); **Tab 64** (Hight Ex. 55) at PLAINTIFF0000391-PLAINTIFF0000412; **Tab 68** (Hight Ex. 59) at UC0003341-UC0003346.

145. Dean Anderson considered "the totality of the facts" including Plaintiff's letter to the AAC and that Plaintiff had reported taking zolpidem, as well as the April 30, 2023 email, the CAP's findings and AAC's conclusions, to reach "a sound conclusion." **Tab 69** (Anderson Dep. Tr.) at 17:6-21, 29:10-20, 36:22-37:7.

146. Based upon his review of these documents, Dean Anderson agreed with the CAP on the four reasons why the CAP unanimously recommended dismissal. **Tab 69** (Anderson Dep. Tr.) at 17:6-8, 18:15-19, 19:7-8, 45:16-20, 46:8-47:1.

147. Dean Anderson was asked to testify regarding the statement in the slide deck that the CAP felt that Plaintiff "dismissed both the egregious nature of the most recent professionalism issue and he appeared to disregard the other instances that his unprofessional behavior was discussed," and testified that this point "speaks to a . . . broader concern . . . that [Plaintiff] struggled to internalize feedback to become a better student," which Dean Anderson said was "a really

important part of professionalism . . . in medicine" and a point that he considered amongst the totality of all the evidence before him. **Tab 69** (Anderson Dep. Tr.) at 47:6-23; *see also* **Tab 70** (Anderson Ex. 107) at 20.

148. Dr. Anderson also agreed with the conclusions of the AAC as set forth in the AAC's September 11, 2023 memorandum. **Tab 69** (Anderson Dep. Tr.) at 66:2-17. He ultimately determined that the totality of Plaintiff's behaviors were grounds for dismissal and that the April 30, 2023 email fit with a larger pattern of unprofessional behaviors in upholding the CAP's recommendation that Plaintiff be dismissed. **Tab 69** (Anderson Dep. Tr.) at 35:12-39:18, 69:1-70:17.

149. Dean Anderson agreed with the AAC that even if it were the case that Plaintiff was impaired by a medication at the time he sent the April 30, 2023 email, that incident was an "unusual and egregious activity" that "fits within a larger pattern of unprofessional behavior." **Tab 69** (Anderson Dep. Tr.) at 36:18-21, 38:2-6.

150. In an email dated September 11, 2023, Dean Anderson informed Plaintiff that he had reviewed the recommendations of the AAC regarding its vote to uphold the CAP's decision to dismiss and had decided to uphold those recommendations, thus making the decision to dismiss Plaintiff from PSOM "final within the University." **Tab 6** (Pl. Dep. Tr.) at 295:3-296:8; **Tab 71** (September 11, 2023 email from Dean Anderson to Plaintiff) (admitted to the record as Hight Ex. 58, *see* Tab 6 (Pl. Dep. Tr.) at 295:3-15) at UC0001781.

## V. <u>Information About Comparator Students</u>

151. During the time that Plaintiff was enrolled at PSOM, only 17 students other than Plaintiff received a PCR, and only two of these 17 students received more than one PCR. *See* **Tab 72** (PSOM Students Who Received a PCR, Academic Probation, or Both (2018–2019 to 2022–2023)) (admitted to the record as Dorsey Ex. 105, *see* Tab 14 (Dorsey Dep. Tr.) at 69:2-70:18) at 2.

152. Of the other medical students who received a PCR, were placed on Academic Probation, or both during the time period starting with the 2018-2019 academic year through the 2022-2023 academic year, one other student in addition to Plaintiff, identified as Student 19, was dismissed after receiving two PCRs and being on Academic Probation. **Tab 14** (Dorsey Dep. Tr.) at 69:2-70:1; **Tab 72** (Dorsey Ex. 105) at 2.

153. Dr. Dorsey testified that of these students who were not dismissed, none of these students committed a professionalism issue that was as serious as the April 30, 2023 email that led to Plaintiff being considered for dismissal and ultimately dismissed, including Student 18 who had received three PCRs and was placed on Academic Probation but who did not impersonate another medical student. **Tab 14** (Dorsey Dep. Tr.) at 72:13-75:4.

## VI. Hight's Testimony in This Litigation, and Information Regarding His Alleged Use of Zolpidem

154. On May 12, 2023, Plaintiff told Dr. Berrier that he had taken zolpidem a total of four times as of that date, and that he continued to take mirtazapine—which he began taking for insomnia in February 2019—as well. **Tab 6** (Pl. Dep. Tr.) at 69:5-70:3; **Tab 73** (May 12, 2023 UChicago Student Wellness Encounter) (admitted to the record as Hight Ex. 9, *see* Tab 6 (Pl. Dep. Tr.) at 68:25-69:3) at UCSW0000227; **Tab 45** (Hight Ex. 3) at 7 (interrogatory response no. 6).

155. Plaintiff testified at his May 27, 2025 deposition that he no longer takes zolpidem, and that he currently takes mirtazapine for sleep, which works "pretty well." **Tab 6** (Pl. Dep. Tr.) at 60:17-61:18, 65:7-20, 66:4-21.

156. In the instant litigation, and at his deposition, Plaintiff asserts that he has no memory of creating the email account, that he believes he was "sleepwalking" or "under some kind of dream spell" when the April 30 email was created because zolpidem is known to cause abnormal complex sleep behaviors, and that the email was "like a one-time thing that happened as a result of strange

medication interactions" and was "something that has never happened in the past and has never happened again in the future." **Tab 6** (Pl. Dep. Tr.) at 146:16-149:15, 151:1-153:15, 397:20-398:10.

157. Plaintiff testified during his deposition, "I really just wanted to emphasize today that me apologizing for something doesn't – isn't indicative of me actually admitting to doing that action." **Tab 6** (Pl. Dep. Tr.) at 257:17-20.

Date: October 30, 2026

Respectfully submitted,

s/ Scott L. Warner

Scott L. Warner
Mary E. Deweese
Husch Blackwell LLP
120 South Riverside Plaza, Suite 2200
Chicago, Illinois 60606
(312) 655-1500 (tel.) | (312) 655-1501 (fax)
scott.warner@huschblackwell.com
mary.deweese@huschblackwell.com

*Attorneys for Defendant*
*University of Chicago*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused the foregoing LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT and the attachments thereto, identified as the Exhibit Table of Contents (Attachment 1) and Tabs 1-5 (Attachment 2), to be filed with the Clerk of the Court using the CM/ECF system, which will send electronic notification to all registered counsel of record this 30th day of October, 2026. The undersigned attorney further certifies that he caused the documents identified as Tabs 6-73 in the foregoing document to be filed with the Clerk of the Court using the CM/ECF system under seal, and served copies of such documents on the following counsel of record via email this 30th day of October, 2026:

Joseph P. Selbka
MacDonald, Lee, & Senechalle, LTD
2300 Barrington Road, Suite 220
Hoffman Estates, Illinois 60169-2034
pleadings@pmllegal.com
(847) 310-0025

s/ Scott Warner